### MAYER v. NETHERSOLE.

(Supreme Court, Appellate Division, First Department. April 25. 1902.)

1. CONTRACTS—CONSTRUCTION—"PROFITS"—EVIDENCE—CUSTOM.
   Plaintiff contracted to act as manager for defendant, an actress, for two seasons, for a certain weekly salary, and commission on the "profits" in excess of a certain sum. Her brother was her treasurer, and kept separate accounts, one of the cost of production and other expenses in preparing for the season, and the other of the running expenses and the receipts of the business. A copy of the latter account was furnished to plaintiff weekly, and a copy of the former about a month after the opening of the season. At the termination of the contract defendant took all the properties, etc., included in the production account, without objection from plaintiff. Plaintiff had no voice in determining the expense of production. It was conceded that it was the custom in the theatrical profession, "where the equipment is paid out of the profit account, to divide it after the season closes according to the terms of the agreement." Plaintiff testified that at the time of making the agreement defendant spoke of having to produce the plays, and he said there should be a certain amount allowed for the production before any profits were divided, and a certain sum was reserved therefor. *Held*, that by the word "profits" in the contract the parties meant the difference between the receipts and the running expenses, without reference to the production account.

2. JUDGMENT—REFEREE—AWARD—OFFSET OF ERRORS.
   Where, on appeal from a judgment rendered on the report of a referee settling an account, an error in the allowance of an item against defendant is more than offset by items erroneously allowed in his favor, the judgment should not be reversed.
   O'Brien, J., dissents.

Appeal from judgment on report of referee.

Action by Marcus H. Mayer against Olga Nethersole. From a judgment for plaintiff, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

Benjamin Steinhardt, for appellant.
Mitchell S. Erlanger, for respondent.

LAUGHLIN, J. The appellant is an actress, and the respondent is a theatrical manager, both of many years' experience. The action was brought to recover a balance of commissions on the "profits" of two theatrical seasons under the following contract, to wit:

"5 Norfolk Street, Park Lane W.
"July 25th, 1898.

"My Dear Marcus Mayer: The arrangement between us is that you shall act for me as my American manager for two seasons in America, to commence on November twenty-first, 1898, at a weekly salary of one hundred dollars during each season. In addition, you are to receive as commission

on my profits of each season twenty-five per cent. of the first five thousand dollars, after the first twenty thousand dollars profit, thirty per cent. of the next five thousand dollars, and thirty-five per cent. of everything over said amounts. Should I take a partner for my forthcoming London season, you are to receive, in lieu of the above commission for the American tours, seventeen per cent. of the first five thousand dollars after the twenty thousand dollars aforesaid, and twenty per cent. of all profits over twenty-five thousand dollars and a weekly salary of $100. My American tours are to be advertised as follows: 'Olga Nethersole's Company; direction Marcus H. Mayer.' You are to give your personal and exclusive attention, and I am to charge to the expenses of my tours three hundred dollars per week for my personal expenses.

"Yours, truly,                                                    Olga Nethersole.
    "I accept the above: Marcus R. Mayer."

The contract was prepared by the parties without the aid of attorneys, and executed at the appellant's country home in England on the day it bears date. The appellant took no partner for her London season. The controversy is over the meaning of the word "profits." The appellant contends that the cost of "production," which includes scenery, costumes, properties, and other expenses in preparing for the commencement of the theatrical season, as well as running expenses, including salaries, railroad fares, royalties, advertising, etc., must be deducted before there are any profits, and the respondent insists that the cost of "production" should not be deducted. The referee has held, in effect, that the cost of "production" was a part of appellant's permanent capital invested, not merely for these two seasons, but for the future, the property being and remaining hers; and that, therefore, the cost is not to be deducted in determining the amount of profits upon which the respondent's commissions are to be computed under the contract. In making up his statement of account, however, the referee did not adhere strictly to this rule; but the plaintiff has not appealed, and we are not called upon to determine what items allowed might have been rejected if the theory adopted by the referee be sustained.

The appellant, through her brother, who was her treasurer, kept two separate accounts,—one a "production" account, involving the items heretofore indicated as embraced in that term; and the other an account of running expenses, including the items heretofore indicated as embraced in those terms and the receipts of the business. A copy of the account of the receipts and running expenses, which did not include any of the items of the "production" account, was given to the respondent weekly, and the items of this account are not involved in the appeal. A statement of the production account was furnished to the respondent about a month after the opening of each season. When the first statement of the production account was given to him, according to his testimony, he said to the treasurer: "That has got nothing to do with me; that comes under the $20,000 allowed;" to which Mr. Nethersole replied, "Well, I just gave you the account to tally with our books."

The appellant's counsel has stipulated that only the exceptions to the disallowance of certain specified items included within the cost of production would be urged on this appeal. These items are as follows:

### For the First Season.

| | |
|---|---|
| Six months' hire of Carmen costumes........................... $ | 980 00 |
| Nov. 29.  Carl Mayer for wigs...................................... | 18 00 |
| Dec. 12.  Mr. Herman, on account of costumes for Camille........ | 500 00 |
| Jan. 27.  Mr. Herman, balance account........................... | 1,427 50 |
| Feb. 9.  Wardrobe trunks ...................................... | 59 00 |
| Feb. 15.  Herman, further costumes.............................. | 12 00 |
| Dec. 3.  Mr. Frohman for Carmen scenery and dresses and properties ...................................................... | 600 00 |
| Gratuity to porter............................................. | 3 00 |
| Termagant scenery, and costumes and properties................. | 7,220 00 |

### For the Second Season.

| | |
|---|---|
| Carmen wardrobe ............................................. | 475 00 |
| Wigs ........................................................ | 57 00 |
| Trip to Paris................................................. | 60 00 |
| Profligate scenery ........................................... | 181 75 |
| Scenery ..................................................... | 1,342 15 |
| Carpenters .................................................. | 1,722 52 |
| Costumes .. ................................................. | 450 00 |
| Wardrobe ................................................... | 1,595 62 |
| Furniture bought of Mr. Seidle............................... | 1,048 50 |
| Miss Nethersole's dresses..................................... | 4,150 00 |

The principal plays produced by the appellant during these two seasons were "The Termagant," "The Profligate," "Carmen," "Camille," and "Sapho." The appellant had, prior to the execution of the contract, produced "Carmen" in London, and had purchased the "scenery, dresses, and property" secondhand, although it appears that certain costumes were hired for the following season in America. Before the contract went into effect "The Termagant" had been played by appellant for six weeks and a half in London, and she was the owner of the scenery, properties, and costumes therefor. Evidently this was within the contemplation of the parties at the time of making the contract, as appears from the statement, "my forthcoming London season." Some scenery was subsequently purchased for "The Profligate," and also costumes for "Camille." Stock scenery, that was in the theaters, was used for the other plays in appellant's repertoire except "Sapho." "Sapho" was not produced until the second year. The equipment for "Sapho" was purchased outright. The appellant furnished as part thereof several dresses previously purchased and worn as part of her private wardrobe, which were charged in the production account at $1,750. As appears from the items quoted, the costumes for "Carmen" for the first year were rented for $980. These are the same costumes which became the property of the appellant the following year upon the further payment of $475. "Carmen" was not played during the second season. All of the other disputed items were expenditures for property which, while essential to the production, was of a permanent nature, and was retained by the appellant as her own. "The Termagant" equipment was taken back to London, and was worth at the time of the trial 50 per centum of its cost. The equipment for the other plays, except possibly "The Profligate," was in good condition at the time of the trial, and worth its original cost, and was likewise retained and used by appellant on her subsequent starring tours. During the first season the respondent received, besides his weekly salary, on account

of profits, $1,637.57, and during the second season $1,231.73. The judgment is for the balance. No settlement was had at the end of the first season, and at the end of the second season no statement was rendered to respondent showing the amount of his commissions, but the weekly statement showing the profits, without deducting the cost of production, was rendered as usual.

It was conceded that it was the custom in the theatrical profession, "where the equipment is paid out of the profit account, to divide it after the season closes * * * according to the terms of the agreement." The respondent testified, without objection, that at the time of making the agreement the appellant spoke of having to produce the plays, and that he said: "There should be a certain amount allowed for the production before any profits were divided. I said, 'Well, $20,000,' and she agreed that would be sufficient." The appellant was asked if there was any conversation "as to how that $20,000 was to be expended," and answered, "None whatever." This question was objected to, and the referee stated that, if any evidence had been received on that subject, he was not aware of it, and should not regard it as binding upon him in the construction of the contract, and she was asked no further questions.

If we had before us the parol communications leading up to the contract, the sense in which the word "profit" was used would doubtless clearly appear, and it is by no means certain that the contract was not sufficiently ambiguous on this subject to justify parol evidence to show the sense in which the word "profit" was used by the parties. Paper Co. v. Moore, 104 N. Y. 680, 10 N. E. 861; Flagler v. Hearst, 62 App. Div. 18, 70 N. Y. Supp. 956. The ruling of the referee, however, that there was no ambiguity, relieved the appellant of proving the conversation between the parties, and this ruling seems to have been acquiesced in by both parties. We are therefore required to interpret the contract from the language employed.

The respondent was given no voice in deciding what plays should be produced, and whether they should be produced with the appellant's own equipment, with equipment to be purchased, or with stock scenery and hired costumes. Nor does it appear, except as to certain items, whether the necessary equipment could have been hired. No provision was made for a division or sale of the equipment or capital remaining at the end of the contract period, according to the conceded custom of the profession, where the expense of production is first deducted from the profits. The respondent was an employé, technically speaking, but he was also, in a sense, jointly interested in the venture. It is reasonable to suppose that, had it been contemplated that the cost of production was to be deducted from the returns before there were to be any profits for division, some agreement would have been made on the subject. In manufacture, agriculture, and ordinary business the word "profit" ordinarily means the excess of returns over expenditures, and may or may not, according to circumstances, include in the returns any increase in value of the capital, and in the expenditures any depreciation of capital. In a more scientific sense, it relates to that excess which remains after deducting from the returns not only the operating expenses and de-

preciation of capital, but also interest on the capital employed. The appellant could not be heard to say that she intended in her offer to use the word "profit" in a technical or a scientific sense; for the respondent presumably accepted it according to its ordinary meaning. She seeks to attach to it a special meaning, different from the sense in which it is ordinarily used in the business world. She includes among the expenditures the cost of production, which is the money embarked in the venture at the outset, but she takes no account of the assets at the expiration of the contract.

The transaction appears to have been a limited joint enterprise. The appellant was to contribute her time, talent, and necessary equipment to produce the plays, and the respondent was to contribute his time and skill as manager. The sum of $20,000 was fixed as a proper compensation for the excess of her investment and hazard, to be first deducted from the profits. Then the parties were to share in the remaining profits according to the percentage specified. We think the proper construction of the contract is that she was to bear the expense of production, and that it was within the contemplation of the parties that this would be covered by the $20,000. Each case of this character must be decided upon its own peculiar facts. We find no authority directly in point, but these views are supported by analogous decisions. Eyster v. Board, 94 U. S. 500, 24 L. Ed. 188; Rubber Co. v. Goodyear, 9 Wall. 788, 804, 19 L. Ed. 566; Park v. Locomotive Works, 40 N. J. Eq. 114, 3 Atl. 162, affirmed 45 N. J. Eq. 244, 19 Atl. 621; Tutt v. Land, 50 Ga. 339; People v. San Francisco Sav. Union, 72 Cal. 199, 202, 13 Pac. 498; Connolly v. Davidson, 15 Minn. 519, 530 (Gil. 428), 2 Am. Rep. 154; Braun's Appeal, 105 Pa. 414; Proudfoot v. Bush, 7 Grant, Ch. 518, 523; Bates, Partn. §§ 229, 230; Lindl. Partn. (2d Am. Ed. p. 12) p. *8; Bouv. Law Dict. (Rawle's Revision) tits. "Profits," "Net Profits."

The case of Eyster v. Board, supra, is quite in point. There the government advanced $1,500,000 for the purpose of building the buildings for the Centennial Exhibition, which the statute required to be repaid "in full before any dividend or percentage of profit shall be paid to the holders" of stock in the corporation. The corporation sought to deduct the amount of subscriptions from the assets out of which the advance was payable. The court said:

"The capital stock was not employed in, but to prepare for, the business of the contemplated exhibition, and the receipts of the exhibition, over and above its current expenses, are the profits of the business. These were the only profits anticipated. They are in fact the net receipts, which, according to the common understanding, ordinarily represent the profits of a business. The public, in referring to the profits of the business of a merchant, rarely ever take into account the depreciation of the buildings in which the business is carried on, notwithstanding they may have been erected out of the capital invested. So, popularly speaking, the net receipts of a business are its profits. So here, as the business to be carried on was that of an exhibition, and its profits were to be derived from its receipts, to the popular mind the net receipts would represent the net profits."

Hence it was held that stock subscriptions could not be repaid before there were "profits" out of which to reimburse the government.

This seems also to be the practical construction which the parties themselves placed on the contract. The appellant kept the production account entirely separate and distinct, and, although settlement of the other accounts was regularly made, this was allowed to stand unadjusted, and the respondent had notified the appellant's treasurer that it did not concern him. The appellant assumed to retain and utilize the equipment as her own, and the respondent seems to have made no objection thereto. The language employed will bear this construction, and it seems equitable.

If it were not for the fact that purchase of the costumes for "Carmen" during the second season was made at a figure very low in comparison with its rental for the prior season, which indicates an understanding that it was to be purchased, it might be doubted whether the item of $980 was not a proper expense to be deducted before paying the respondent's commission; but it is apparent, on examination of the decision of the referee, that he erroneously allowed the appellant for insurance and other items of expense properly belonging to the production account in excess of this amount.

Therefore, on a review of the whole case, we find no reversible error, and the judgment should be affirmed, with costs. All concur, except O'BRIEN, J., who dissents.