## S. O. MORROW et al., Respondents, v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

**Springfield Court of Appeals, December 6, 1909.**

1. **COMMON CARRIER: Shipping Contract: Delay in Shipment.** The stipulations in a bill of lading limiting the liability in case of loss or damage to the goods shipped and requiring claims for damages to be reported in writing within a certain time, do not apply to a claim for damages to the shipper on account of delay in shipment, but only to those cases of loss or damage done to the goods.

2. ————: **Delay in Shipment: Notice to Carrier: Authority of Agent.** In a suit for special damages on account of delay in a shipment of mill rolls, where the shipper explained to the carrier's station agent and shipping clerk the nature of the shipment and the importance of promptness in the transportation thereof—the evidence examined and held to show the agent's authority and notice to them was sufficient to inform the carrier.

3. ————: ————: ————: **Special Damages.** Where a carrier has received from the shipper sufficient notice of the importance of the shipment and the necessity for haste, and having entered into the contract with full notice of the consequences that might ensue in case of delay, it is bound, in case of negligent delay of such shipment, for such special damages as naturally and proximately result therefrom, which were reasonably within the contemplation of the parties.

4. ————: ————: **Special Damages: Sufficiency of Notice.** Notice to a carrier to charge it with special damages in case of negligent delay in a shipment, does not require positive information; but facts and circumstances that will put a person of ordinary caution in the same situation on inquiry that will reasonably lead to a knowledge of the truth are sufficient when properly brought home to the carrier.

5. ————: ————: ————: **Wages of Employees: Loss of Profits.** In a suit for special damages on account of negligent delay in a shipment of mill rolls, the absence of which rolls necessitated the shutting-down of the mill, of which consequence the carrier had notice at the time of receiving the shipment—the wages paid the mill employees during the unnecessary delay were held a proper item of damage recoverable from the carrier; the mill being an established business and the prob-

Morrow v. Railroad.

able profits during the enforced idleness being reasonably ascertainable from the prior earnings, the loss of profits were also recoverable, but the evidence in this case is held insufficient to show what would have been the profits during the period covered by the delay in the shipment.

6. **DAMAGES: Loss of Profits, When Recoverable.** The general rule as to the recovery of anticipated profits in a commercial business is that they are too remote, speculative, and too dependent upon changing circumstances to warrant a judgment for their recovery. They may be recovered only when they are made reasonably certain by proof of actual facts which present data for a rational estimate of their amount. A well-recognized exception to the general rule is that the loss of profits from the interruption of an established business may be recovered; but it is held in these cases that proof of the expenses and of the income of the business for a reasonable time anterior to and during the interruption of the business or facts of equivalent import is indispensable.

7. ———: **Profits: Definition.** "Profits," in the ordinary acceptation of the law, is the ordinary benefit or advantage remaining after all costs, charges or expenses have been deducted from the income.

8. **EVIDENCE: Presumption: Usual Course of Business.** It is the presumption of law that the usual and ordinary course of business has been pursued in a business transaction.

9. ———: **Shop-book Rule.** The "American rule" or "shop-book rule" is, that account books of original entries fair on their face and shown to have been kept in the usual course of business are competent evidence.

10. ———: **Presumption Against Party Not Producing.** Where a party has certain documents in his possession, which are important to sustain his case and which he does not produce, such evidence will be taken most strongly against him.

11. **INSTRUCTION: Loss of Profits.** In that class of cases where loss of profits are recoverable, the instructions of the court should direct the jury to a legal definition of the word profits and should also call their attention to the rule of law by which they are to be guided in arriving at the conclusion as to the amount of the profits.

## Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

REVERSED AND REMANDED.

*Martin L. Clardy* and *Edw. J. White* for appellant.

(1) The plaintiffs' evidence failing to establish a contract to reimburse them for loss of profits, in case of delay, or to impart notice to defendant that their mill could be operated at a profit, and no loss of profits being shown, by any legitimate evidence, since such profits amounted to mere speculation, from the facts shown, and no legal basis for the liability for loss of profits was established, the defendant's demurrer should have been sustained. Hadley v. Baxendale, 9 Exch. 341; Howard v. Stillwell Mfg. Co., 139 U. S. 199, 35 Law Ed. 147; Burdall v. Johnson, 122 Mo. App. 119; Connoble v. Clark, 38 Mo. App. 482; Taylor v. McGuire, 12 Mo. 313; Galloway Mining Co. v. Clark, 32 Mo. App. 309; Rogan v. Railroad, 51 Mo. App. 665; Prior v. Railroad Co., 85 Mo. App. 367; York v. Everton, 121 Mo. App. 641; Railroad v. Planters' Gin, etc., Co., 113 S. W. 355; Harvey v. Railroad, 124 Mass. 421, 26 Am. St. 673; Goodin v. Railroad, 125 Ga. 630, 54 S. E. 720, 6 L. R. A. (N. S.) 1054; Holloway v. Shoe Co., 151 Fed. 216, 80 C. C. A. 568, 10 L. R. A. (N. S.) 704; Nichols v. Rash, 138 Ala. 372, 35 So. 409; McNeil v. Steele Co., 207 Pa. St. 493, 56 Atl. 1067; Toolworks Co. v. Welisch, 128 Fed. 693, 63 C. C. A. 245; Wilson v. Russler, 91 Mo. App. 275; Paquin v. Railroad, 90 Mo. App. 118. (2) The evidence only showed that notice was given of the fact that the shipment contained mill rolls, without disclosing the material fact that a loss of profits would result from the delay in the shipment, and this was not such notice from which an implied promise could be held, to reimburse the plaintiff's for a loss of profits, when it was not shown that it had notice that such loss would result from the any delay in the shipment. Gray v. Railroad, 54 Mo. App. 666; Swift River Co. v. Railroad, 169 Mass. 326, 47 N. E. 1015; 8 Am. and Eng. R. Cas. (N. S.) 513; Bradley v. Railroad, 94 Wis. 44, 68 N. W. 410. (3) The court erred in refusing to submit to the jury the authority of the defendant's agent to make, by implica-

tion, any change in its regular contract to pay for a loss of profits, when such authority was expressly denied, in the contract by which the shipment in this case was made. Handley v. Railroad, 55 Mo. App. 505; Minter v. Railroad, 56 Mo. App. 282; Rogan v. Railroad, 51 Mo. App. 665; Meriwether v. Railroad, 107 S. W. 440; Hutchinson, Carriers, sec. 171; O'Brien v. Kinney, 74 Mo. 125; Leonard v. Railroad, 54 Mo. App. 293.

*Thomas & Hackney* for respondents.

(1)　The clause in the bill of lading relating to loss of property only refers to the loss or damage of the goods, and it does not cover the owners' damages sustained by reason of a failure to carry and deliver the goods within a reasonable time. Klass Com. Co. v. Railroad, 80 Mo. App. 164; Aull v. Railroad, 116 S. W. 1122; 136 Mo. App. 291. (2) No notice was necessary under the facts of this case. Leonard v. Railroad, 54 Mo. App. 293; Hardin Grain Co. v. Railroad, 120 Mo. App. 203; Ward v. Railroad, 158 Mo. 226. (3) The authorities are nearly universal that profits can be recovered. Gildersleeve v. Overstolz, 90 Mo. App. 518; Stewart v. Patton, 65 Mo. App. 21; Wolf Shirt Co. v. Frankenthal, 96 Mo. App. 307; Hammond v. Beeson, 112 Mo. 190; DeDonato v. Morrison, 160 Mo. 581; Hendrix v. Railroad, 107 Mo. App. 127; Pruitt v. Railroad, 62 Mo. 527; Steffen v. Railroad, 156 Mo. 323; Brandt v. Schuchmann, 60 Mo. App. 70; Gray v. Railroad, 54 Mo. App. 666; Railroad v. Planters' Gin and Oil Company (Ark.), 113 S. W. 352; Dart v. Laimbeer, 107 N. Y. 664; Standard Supply Co. v. Carter & Harris, 62 S. E. 150, 19 L. R. A. (N. S.) 155; Elzy v. Adams Express Co., 119 N. W. 705; American Bridge Co. v. Glenmore Distillers Co., 107 S. W. 279; Implement Co. v. Railroad, 85 Pac. 408, 6 L. R. A. (N. S.) 1058; Turner v. Railroad, 7 L. R. A. (N. S.) 188, 54 S. E. 825; Weston v. Railroad, 4 L. R. A. (N. S.) 569, 76 N. E. 1050.

STATEMENT.—The plaintiffs' cause of action in this case was for damages for the delay in the shipment of certain mill rolls. The evidence tended to show the following state of facts:

That at and prior to the institution of this suit, the plaintiffs were partners owning and operating a flour mill on Spring river near Carthage, Missouri, and the defendant operated a line of railroad and was a common carrier of freight and passengers between Carthage, Missouri, and Leavenworth, Kansas, and elsewhere. On about the 28th day of September, 1907, the mill rolls being a part of the machinery of the plaintiffs' mill and necessary for the operation, became worn and defective and had to be repaired, and it was necessary to send the same for that purpose to the Great Western Manufacturing Company, of Leavenworth, Kansas, the plaintiffs having made an agreement with that company to repair said rolls upon receipt of the same and return them promptly to the plaintiffs. On the 28th day of September, 1907, the rolls were taken to the station of the defendant company at Carthage, Missouri, and delivered to it for shipment to Leavenworth, Kansas. Plaintiffs notified the shipping clerk who took charge of the freight at the time of shipment and who issued the bill of lading of the nature of the shipment, the purpose for which the rolls were being shipped, the necessity for prompt shipment of the same, and that while the rolls were away from the mill it would have to stand idle. The defendant, with such knowledge, agreed to transport the rolls to Leavenworth, Kansas, and did receive the same for the purpose of transporting them. The defendant's shipping clerk, at the time he received the freight for shipment, gave the plaintiffs a bill of lading on which was endorsed,—"Mill rolls, rush," in pencil memorandum.

The bill of lading contained a condition that all claims for damages must be reported by the consignee in writing within thirty-six hours after he was notified

of the arrival of the freight, and that there was no liability unless such notice was given. The goods were transported and delivered to the consignee and no notice for claim for any damages was given the defendant.

Another condition of the bill of lading was "that in the event of loss of property under the provisions of this agreement, the value or cost of the same at the point of shipment shall govern the settlement."

The mill rolls were sent to be recorrugated. The bill of lading was signed by the defendant's shipping clerk. The rolls were lost or delayed in the course of the fulfillment of the contract of shipment, and did not reach their destination until October 16, 1907, and were some eleven days longer in transportation than they should have been in the ordinary course of business. The mill, during this time, remained idle awaiting the return of the mill rolls.

At the trial, the plaintiffs introduced evidence tending to show the number of hands they had employed and the amount paid them during the time that the mill was idle. One of the plaintiffs, S. O. Morrow, testified as to the profits they lost by reason of the unnecessary delay in transportation in substance as follows: He stated that he had been connected with his present mill for twenty-two years; that it was a roller flour mill—both water and steam; that his trade was principally in the south, but that he also had a fair local business in Carthage; that they made, besides flour, chops, ground meal and bran. That the mill had been shut down prior to September 28th since July; that there was nothing to prevent the mill from running except the rolls and the mill was ready to run when the rolls were sent away for repairs; that they had no other rolls and couldn't procure any sufficient to run the mill. He then gave the names of the different employees and the amount he had to pay them per month while the mill was idle, and stated that he had no work for them to do which could not have been done while the mill was

running. He stated that they had always had a market for their product; that they had wheat and material in the mill on hand to grind and operate. "Q. Now, Mr. Morrow, you may state, keeping inside of any doubt, what would have been the reasonable profits per day in the operation of the mill during the eleven days' time above the usual period to transport the rolls, taking into consideration the capacity of the mill, what you had on hand and the market, under the conditions at that particular time? A. Under the conditions at that particular time, $75.00 per day, I would have expected to have made more than that." "Court. You mean that amount made above all expenses if you had the rolls? A. Yes, sir."

On cross-examination, the witness testified in substance as follows: The mill was not operated from July until the rolls were returned in October. During that time, I turned out no flour, and had no men on the road; can't say whether I had orders out at that time. Would have started the mill as soon as the rolls returned. "Q. How can you tell what the profits would be on wheat sold unless you knew what orders you had for wheat and what price you make on flour? A. I didn't answer that kind of a question. He asked me what the profit of the mill would have been per day under the conditions at that time if the rolls had been there. I would had to have had men on the road to take orders in order to make a profit." I couldn't entirely depend on the local market at Carthage. We had men waiting to start on the road. Could not have made a profit without having men on the road and taking orders, nor run at a profit and supply Carthage alone, but didn't get all our orders from salesmen. We had a man ready to start at the time the rolls went away, but never tried his capacity; he had been in the flour business for thirty years. I can't give you the price of wheat. The price of wheat would regulate the profit on flour. Wheat was at a high point, a dollar and one cent, but was not that at all times; dur-

ing the time the rolls were away there was an advance in the market on wheat and flour; when we got the rolls back, the market was on the decline, and we sold a large quantity of wheat at twelve and fifteen cents a bushel less. We could have ground at the mill if we had had the rolls. We didn't sell the wheat because we wanted to mill it. The sales of flour would depend not only on the value of wheat, but on the orders for flour and the market at the time.

We could have operated the mill at a profit during that period if we had had enough orders for future shipment to keep us running. The profit depends upon the market. When I sell flour, I know how much I am going to make, but I can't tell what the profit will be until I do sell it. I don't know what the profit for the year will be until the end of the year. The profit would depend upon the character of the flour and the regularity in running the mill. All these things would enter into the final result of a year's work, in determining whether the mill was run at a profit. Our average capacity was two hundred barrels a day. We had more wheat than we could have ground into flour in that eleven days. We carried insurance and paid taxes and borrowed money to buy wheat.

Other testimony was offered by plaintiffs tending to corroborate the statements of Mr. Morrow.

Judgment was rendered for the plaintiffs for three hundred dollars. The defendant made timely motions for a new trial and in arrest, and these being overruled, perfected his appeal as the law requires.

## I.

NIXON, P. J. (after stating the facts).—It will be seen by the foregoing statement that this is an action for damages caused by the negligence of the defendant, a common carrier. The plaintiffs delivered to the defendant carrier certain mill rolls to be transported to Leavenworth, Kansas, for recorrugation. At the time

the machinery was delivered to the defendant and the bill of lading issued, the carrier was informed that the freight consisted of mill rolls—a rush shipment—and that while the rolls were away, the mill would be shut down. The rolls were eleven days longer in transit than the usual time, for which plaintiffs have asked special damages.

The bill of lading contains the following condition: "In the event of the loss of property under the provisions of this agreement, the value or cost of the same at the point of shipment shall govern the settlement." The evidence in this case shows that the mill rolls were not lost or damaged in transit, and that they were of the same value at the point of delivery to the consignee as at the point where they were received by the defendant company. The defendant claims that under the provisions of this contract, the measure of recovery of damages in this case for the *delay* was the value or cost of the rolls at the time they were received by the company for shipment.

Aside from any special agreement, the undoubted rule is that the measure of damages in cases of loss or damage caused by the negligence of the carrier would, under this stipulation, be the value or cost of the mill rolls at the point of shipment. It will be noted that this is an action, *not for loss or damage* caused by the defendant company to the mill rolls themselves, *but an action for special damages caused the shipper himself by reason of the delay.* The rule is well established in the decisions of this State and other jurisdictions that a clause in a shipper's contract—like the one under consideration—only covers *loss* or *damage* done to the goods, and does not cover the owner's damage sustained by reason of the mere failure to carry and deliver the goods in a reasonable time. [D. Klass Commission Co. v. Wabash R. Co., 80 Mo. App. 164; Live Stock Co. v. K. C. M. & B. Ry. Co., 100 Mo. App. loc. cit. 689; Aull v. Mo. Pac. Ry. Co., 136 Mo. App. 291, 116

S. W. 1122.] In the Aull case, supra, the court says: "In our opinion, this clause in the contract was not intended to apply to damages in the nature here sued for. The loss or damage there referred to was meant to cover the loss or damage done to the goods themselves, and does not cover the owner's damage by reason of mere failure to carry and deliver the goods within a reasonable time."

## II.

The bill of lading contained the further clause that claims of damage must be reported by the consignee in writing within thirty-six hours after the said consignee was notified of the arrival of such freight at the place of delivery, and if no such notice was given, no liability would ensue, and the evidence was that no notice of any claim for damages was given as provided in the contract.

This stipulation in the bill of lading to notify the carrier in writing within a specified time refers solely to a loss or damage to the mill rolls themselves and not to special damages, and as no loss or damage to the mill rolls themselves is claimed in this case, the stipulation constitutes no defense to the action. Aull v. Mo. Pac. Ry. Co., 136 Mo. App. 291, 116 S. W. 1122. The reasoning of the court in the case of D. Klass Commission Co. v. Wabash R. Co., supra, would apply to the clause of the bill of lading as to notice that was applied in that case to a stipulation as to liquidation of damages.

## III.

Some question is made by the defendant as to the agency of the shipping clerk and his authority to execute the bill of lading with the pencil memorandum and thereby bind the defendant company.

One of the plaintiffs took the mill rolls to the station of the defendant company, saw its station agent

and told him that it was an important shipment; that respondents were anxious to get the rolls on the road as quickly as possible and that they could not do any business until the rolls were returned. He explained what the shipment was for and marked on the bill of lading, "rush through." This conversation took place before the rolls were delivered to the company for shipment. The station agent said it would be necessary to have the freight billed out and to get the billing clerk to bill them out, which was done as directed. We think, under this state of facts, that there could be no question but what the company, through the agency of its station agent and billing clerk, is justly charged with the notice and statements made to them by the plaintiffs as to the fact that the shipment consisted of rolls belonging to their flouring mill, and that they were duly informed of the importance to the plaintiffs of the prompt transit of the rolls; that it was a rush shipment, and that great damages were likely to befall the plaintiffs in case of delay. It certainly cannot be claimed under these circumstances that the station agent and billing clerk in charge of the business office of the defendant company and receiving this shipment and acting in the usual course of business were not clothed with authority to act for the defendant, and with such apparent indicia of agency as to bind the company; especially when it is recalled that the freight was in fact received by the defendant from them for transit under the agency of these parties. The billing clerk had in his possession at the time the standard printed forms of defendant's bills of lading, and in this action, the defenses to plaintiffs' recovery are bottomed on the clauses of this identical bill of lading.

## IV.

The evidence in this case, adduced in behalf of the plaintiffs, showed that the rolls were delayed in transit by reason of the defendant's negligence, and

that in the ordinary course of transit, they should have arrived at their destination eleven days earlier, and that it is for this delay of eleven days over the usual time of carriage that the plaintiffs seek to recover damages for their losses for hired help they had to keep during the time the mill was shut down by reason of the defendant's negligence, and also for the profits they would have made and received in the operation of the mill during those eleven days had the defendant carried the mill rolls without unreasonable delay.

It will be seen in this case that it is sought to recover of the defendant *special* and *not general damages* for breach of its duty as a common carrier; and that at the time the freight was delivered, it had notice of the importance of the shipment, and that plaintiffs would have to suspend operations until the rolls were returned, and directions were endorsed on the bill of lading to "rush through." This, we think, was a sufficient notice of the importance of the shipment, the necessity for haste, and the injuries that would result to the plaintiffs by reason of delay, and was sufficient to render the company liable for special damages; that the defendant, having entered into a contract with full notice of the consequences that might ensue in case of delay, is bound for such special damages as resulted therefrom which were reasonably within the contemplation of the parties.

The first item of damages claimed is the wages actually and necessarily paid to the men in charge of the mill after the time when, by the use of ordinary diligence, the mill rolls should have been returned. The defendant then at the time of shipping having had notice of the existing facts out of which special damages would naturally arise to the plaintiffs by a negligent delay in the delivery, ought to be held liable for such special damages which naturally and proximately resulted from such delay. The rule seems to be well established concerning the liability of the defendant under such cir-

cumstances. [Elzy v. Adams Express Co., 119 N. W.
705; Cowan v. Western Union Telegraph Co., 122 Iowa
379, 98 N. W. 281; Weston v. Boston & M. Ry. Co., 190
Mass. 298, 76 N. E. 1050, 4 L. R. A. (N. S.) 569, 112
Am. St. Rep. 330; Mo. Pac. Ry. Co. v. Peru-Van-Zandt
Imp. Co. (Kan.), 85 Pac. 408; Central Trust Co. v.
Savannah & W. R. Co. (C. C.), 69 Fed. loc. cit. 685;
Chicago, R. I. & Pac. Ry. Co. v. Planters' Gin & Oil
Co. (Ark.), 113 S. W. 352.] In the case of Central
Trust Co. v. Savannah & W. R. Co., supra, it was held
that it was competent to show by parol that notice was
brought home to the carrier that unusual loss would
result in delay in making the delivery, and under such
circumstances, the carrier was held responsible for the
real damages sustained from such delay; if the notice
given is of such a character and goes to such an extent
in informing the carrier of the shipper's situation, the
carrier will be presumed in such case to have contracted
with reference thereto.

The sufficiency of the notice in this case to charge
the defendant company with liability for special
damages is questioned by the company. Notice, in gen-
eral, does not require positive information, but facts
and circumstances, if sufficiently brought home to a
party, such as to put a person of ordinary caution in
the same situation on any inquiry reasonably leading
to a knowledge of the truth, a court may justly infer
actual knowledge. [Barrett v. Davis, 104 Mo. App.
549; John Deere Plow Co. v. Sullivan, 158 Mo. 440.]

From these general principles of the law, as well
as the special application shown by the adjudications
to cases like the present, we do not hesitate in finding
in this case that the defendant had such notice as to
make it liable for all natural and proximate damages
in consequence of its delay in shipping the rolls in
question. We also think that under this rule, any
damages to the plaintiff partnership by reason of wages
in the payment of necessary help to run their mill dur-

ing the time that it was necessary to shut down by reason of the negligence of the defendant is a just charge and item of damages for which the plaintiffs should be allowed to recover. The authorities seem to hold that the plaintiffs might recover their expenses for the number of hands which were of necessity under pay and idle during the time they were awaiting the arrival of the machinery in order to start the mill. [Priestly v. Northern Indiana & C. R. Co., 26 Ill. 205, 79 Am. Dec. 369; Pacific Express Co. v. Darnell, 6 S. W. 765.]

The plaintiffs further claim as damages, the loss of their anticipated profits which they would have received from their milling business but for the negligence of the defendant company. The general rule as to the recovery of anticipated profits of a commercial business is that they are too remote, speculative and too dependent upon changing circumstances to warrant a judgment for their recovery. [Howard v. Manufacturing Co., 139 U. S. 199, 206, 35 L. Ed. 147; Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co., 152 U. S. 200, 38 L. Ed. 411; Central Trust Co. v. Clark, 92 Fed. 293, 296, 298, 34 C. C. A. 354, 357, 359; Simmer v. City of St. Paul, 23 Minn. 408, 410; Griffin v. Colver, 16 N. Y. 489, 491, 69 Am. Dec. 718; Wilson & Son v. Russler & Gnagi, 91 Mo. App. 275.] Expected profits are in their nature contingent upon many changing circumstances, uncertain and remote at best. They may be recovered only when they are made reasonably certain by proof of actual facts with present data for a rational estimate of their amount, and when this is made to appear, they may be recoverable. [13 Cyclopedia of Law and Procedure, 49.]

There is, however, a well-recognized exception to this general rule. It is that the loss of profits from the interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what was the amount of his profits. [Central Coal & Coke Co. v. Hartman, 111 Fed. loc.

cit. 98; 6 Cyclopedia of Law and Procedure, 448; 13 Cyclopedia of Law and Procedure, 57; Pacific Express Co. v. Darnell, 6 S. W. 765; Simmons v. Brown, 73 Am. Dec. 66.] It is held in these cases that proof of the expenses and of the income of the business for a reasonable time anterior to and during the interruption or stoppage of the business or of facts of equivalent import is indispensable in such cases to a lawful judgment for damages for a loss of anticipated profits. An established business like that of the plaintiffs' is within the exception to the general rule as to allowing profits in the case of the stoppage or suspension of such business. The reason is that such a business institution can generally show what its usual and customary earnings have been prior to the interruption of the business, and such average earnings would constitute a standard by which to measure the loss of profits during the period of its enforced idleness. *But if the plaintiff at the trial fails to offer any satisfactory evidence to establish what the net profits of his mill and milling business have usually and actually been during any previous period, then his case would fall within the reason and principle of the general rule and not within the exception, and his expected profits would be merely conjectural and speculative.*

In a manufacturing or agricultural business, the word "profits" has a fixed and definite meaning. It means the net earnings, or the excess of returns over expenditures and relates to any excess which remains after deducting from the returns the operating expenses and depreciation of capital, and also, in a proper case, interest on the capital employed. "Profit," in the ordinary acceptation of the law, is the benefit or advantage remaining after all costs, charges and expenses have been deducted from the income, because, until then, and while anything remains uncertain, it is impossible to say whether or not there has been a profit. [Mayer v. Nethersole, 71 App. Div. 383, 390, 75 N. Y.

Supp. 987, 990; Mackey v. Miller (Pa.), 6 Phila. 527; Leporte v. Twin Cities Nat. Building & Loan Assn., 5 Pa. Super. Ct. 276, 280; Wallace v. Pennsylvania R. Co., 45 Atl. 685, 195 Pa. 127, 52 L. R. A. 33; Simmons v. Brown, 73 Am. Dec. 66.]

In the case under consideration, the amount of plaintiffs' recovery would be the net profits of their milling business during the period of about eleven days that the mill was compelled to remain idle. The amount of these net profits would be the amount that they would have been able to realize in the usual course of business if their rolls had been promptly returned. But it will be apparent that in order to recover such profits, the evidence would have to show the expenses and income of their milling business for a reasonable time anterior to the interruption, or facts of equivalent import, and without this indispensable showing and without these facts, there is no rational basis by which a reliable estimate could be made. [Goebel v. Hough, 26 Minn. 252, 256, 2 N. W. 847; Chapman v. Kirby, 49 Ill. 211, 219; 1 Sedg. Dam., sec. 182; Ingram v. Lawson, 6 Bing. N. C. 212; Shafer v. Wilson, 44 Md. 268, 278; Central Coal & Coke Co. v. Hartman, 111 Fed. loc. cit. 99; Gildersleeve v. Overstolz, 90 Mo. App. 518; Wolff Shirt Co. v. Frankenthal, 96 Mo. App. 307.]

In the case now under consideration, all the evidence bearing directly upon the loss of profits was the statements of one of the plaintiffs. In a milling establishment of the size of plaintiffs', of twenty years' standing, with a capacity of from 175 to 200 barrels of flour per day, with a large payroll, in which the plaintiffs were partners and in which there would usually be a settlement of the accounts of the partnership at stated intervals, it is a matter of common knowledge that such a business, under modern methods and conditions, could not be carried on successfully without a set of books in charge of a bookkeeper. Such books would contain record entries of the business, an item-

ized account of the amount of the gross receipts and the amount of expenditures and the capital invested. Yet in this case, no such books were produced in evidence, but the evidence of profits rests wholly upon a statement of a lump sum by one of the plaintiffs in the case. The existence of such a set of books, showing the conditions of their milling business from time to time is presumed, and that they are in the possession of the plaintiff. It is the presumption of law that the usual and ordinary course of business has been pursued in a business transaction. [Ivey v. Yancey, 129 Mo. 501; Long v. Joplin Mining & Smelting Co., 68 Mo. loc. cit. 431.] Such books would have been competent evidence in behalf of the plaintiffs. The "American Rule," or "Shop-book Rule" is that account books of original entries fair on their face and shown to be kept in the usual course of business are competent evidence. [Robinson v. Smith, 111 Mo. 205; Anchor Milling Co. v. Walsh, 108 Mo. 277.] These books, as usually kept, would contain entries such as no memory could accurately preserve, and would show the very essential facts upon which the plaintiffs could recover, if at all, for the loss of profits in their business. And yet no books were produced and no explanation was given showing that they were lost or not within the possession of the plaintiffs, but reliance was had, as a substitute, upon the memory of one of the interested parties. The rule of law is that under such circumstances, where the party has the documents within his possession and they are important to sustain his case and are not produced, "that evidence is always to be taken most strongly against the person who keeps back such documents under his control." [Attorney General v. Windsor, 24 Beav. 679, 706.] Besides this, there is an entire failure of the evidence to show in any way what were the total returns of the plaintiff's business, the amount of the operating expenses, and the depreciations of capital, if any, during any previous fixed period of time.

Without such a showing, under the authorities cited, there were no actual facts or reliable data given in evidence that would enable the jury to form a reasonable estimate of the amount of plaintiffs' profits.

According to the plaintiffs' own statements, they could make no estimate of their profits during the year previous to the eleven days' interruption in question. S. O. Morrow, one of the plaintiffs, was examined as follows: "Q. You don't know what your profit is until you sell—you can't tell what your profit is until after you sell it?   A. No, you can't tell until you do sell it (meaning flour), to be sure."   "Q. Now isn't it a fact you operate for awhile, for a month or two and make money and conditions change or some machinery will break and you will have to repair it and sustain a loss, and you don't know what your profit for a year is going to be until the end of the year comes around on the first of July?   Isn't that true?   A. I don't know what the profit for the year will be; no, until the end of the year comes."   If, then, according to his own statement, he could not tell what the profits for any year were until the end of the year, how was it possible for him to give the data and reliable facts to the jury by which an estimate could be made of the loss of their profits for eleven days during that year.   If the standard was to be established by the average profits of the milling business for a time anterior to the stoppage of their business, what basis is there in this evidence showing that any such standard had any existence.   The evidence seems to have proceeded without any real theory of the true meaning of "profits."   This is manifest from another point of view.   One of the plaintiffs, when testifying as a witness, was asked the following question:   "Q. Taking into consideration the market as you knew it to be at that time, the price of wheat, the capacity of your mill, and the character of all material you had on your hands, what do you say now was the earning capacity of that mill, that you lost by being

deprived—what was the earning capacity of the mill worth that you lost by being deprived of the use of the mill per day? The Court.—What do you say? What was the value of the earning capacity of the mill, all expenses and everything taken off that you lost per day by not being able to run the mill on account of the absence of the rolls? Under the conditions then? Taking into consideration your judgment as an experienced operator? A. $75. Under the conditions at that particular time $75 per day I would have expected to made more than that." "The Court: You mean that amount above all expenses if you had the rolls? A. Yes, sir."

This was the only evidence as to the profits of their milling business offered, and it was the only evidence by which the jury could determine the profits of the mill during the eleven days of enforced idleness. It will be seen that the witness was giving his expectation rather than speaking from an actual knowledge. It is not shown that the witness had a true idea as to how the profits should be estimated according to legal rules, and merely answered "yes" to the composite questions put to him by the court and his attorneys and this answer fails to embody the necessary elements to be considered. Upon this one word "yes" hangs all the showing of profits in this case. No facts were given and no facts were known, so far as the evidence goes, which would enable the jury to form a reasonable basis from which they would be authorized to conclude what such profits would be during the eleven days, and the consequent loss to the plaintiffs. The witness answered the question under the conditions of that particular time, "$75.00 per day, I would have expected to made more than that." These conditions existing at that time upon which he made his basis of estimate were not revealed to the jury and could not have been known by them unless they possessed clairvoyant powers; and without this knowledge, his opinion was the merest guess. What was the basis of his conclusions, as we

have said, was not disclosed.   Were they mere conjectures or unwarranted estimates, or were they conclusions from fixed facts from which the net profits of the milling concern could be logically and legally inferred? Three elements only are called to the attention of the witness—the capacity of the mill, what he had on hand, and the market.   This, of course, left out essential elements in estimating the profits, although he added that he meant the amount above the expenses.   The attention of the witness was not called to, and so far as the evidence goes, he did not take into consideration the depreciation of his capital, if any, and other necessary elements of the problem.   Again, the attention of the witness was directed to a certain, particular time, that is, from the 5th to the 16th day of October, and he was asked to make his estimate of the losses of his business for that particular time.   And that his estimate was so made is apparent from his answer in which he says: "Under the conditions at that particular time, $75 per day."   As we have seen, the reason why an established business is excepted from the general rule is, that it has it in its power to prove the capital invested, the amount of the monthly and yearly expenses of operating the business and the monthly and yearly income derived from it for a period prior to the interruption. The expenses of the business, including depreciation of capital, deducted from its income for a few months or years prior to such interruption produces the customary net profits of the business during that time, and from this fixed data and these facts, an estimate can be made of the plaintiffs' loss during the period the business was interrupted.   Nothing of this kind is shown in the evidence to have taken place.   No reliable basis was given to the jury by actual estimate of the previous conditions and profits of the business.   Their experience in conducting their established business, so far as the evidence goes, gave them no proved data from which the anticipated profits were estimated.   If the plaintiffs

had such knowledge, they should have produced it, and until it was produced, according to the rules governing this class of cases, it remained in the region of speculation and conjecture.

Hence we conclude, on a survey of the evidence in the case, that the estimates, speculations and conjectures of the plaintiff, S. O. Morrow, were not shown upon the trial to be based on knowledge of actual facts from which the amount of profits could have been inferred by the jury with reasonable certainty, and that there is no basis shown in the evidence upon which to sustain the judgment rendered. To suffer this judgment to stand, based on such evidence, would be to allow an interested plaintiff to guess the money out of his adversary's pocket into his own and make the court ratify the confiscatory process.

In this class of cases, we think the instructions of the court should direct the jury to a legal definition of the word "profits," and should also call their attention to the rule of law by which they are to be guided in arriving at their conclusion as to the amount of the profits.

For the reasons stated the judgment is reversed and the cause remanded. *Cox, J.,* concurs; *Gray, J.,* not sitting.