## POLLACK v. CARLYE DRESS CORPORATION.

### No. 4643.

District Court, E. D. Missouri, E. D.

March 11, 1948.

Gleick & Strauss and Harry S. Gleick, all of St. Louis, Mo., for plaintiff.

Salkey & Jones, Wilbur B. Jones, Franklin Ferriss and Peter H. Husch, all of St. Louis, Mo., for defendant.

HULEN, District Judge.

Plaintiff's action for an accounting is based on a written contract dated April 7, 1942, by which defendant employed plaintiff for two years and eleven months, ending June 30, 1945, as a stylist in defendant's ladies ready-to-wear manufacturing business; also for publicity and sales promotion work. Plaintiff's salary was $1,000 per month plus bonus of 10% of net profits for year ending June 30, 1943, 15% for second year, and 20% for last year of contract. The contract "defined" the term "net profits" as " * * * determined by the company's (defendant) auditors without the deduction of plaintiff's bonus but less State and Federal taxes * * * ". Defendant is a Missouri corporation. The contract provided for organizing a subsidiary corporation under the laws of New York. Business transacted in New York by defendant was in the name of the subsidiary corporation and net profits were those realized from consolidation of financial statements of the two corporations.

The petition alleges performance of the contract by plaintiff; acknowledges receipt of monthly salary and a check each year as

bonus under the contract. Plaintiff claims payments received as bonus are only a small part of the net profits due him under the contract. The charge is made: defendant's auditors, working in collusion with defendant, deliberately understated net profits for purpose of defrauding plaintiff, the audits were prepared to conceal true net profits, and this purpose was accomplished by undervaluing inventory, overstating expense, and other practices contrary to the usual course of business contemplated by the parties in execution of the contract. Complaint is also made that excessive amounts were set up for reserves for bad debts and contingent litigation liability.

The answer admits execution of contract but alleges plaintiff was paid all sums due him. Defendant further pleads violation of the contract by plaintiff by failure to devote all of his time, energies and skill to styling, publicity and sales promotion as required by its terms. Defendant also counterclaimed. At conclusion of trial defendant announced abandonment of counterclaim excepting money alleged to have been wrongfully taken by plaintiff from defendant's assets at rate of $250 per month for six months following end of the contract, and a further separate item of $600.

The trial was on questions (1) liability of defendant to plaintiff under the contract, and (2) if such liability is found, whether plaintiff is entitled to a reference and reaudit of defendant's books; and (3) on defendant's counterclaim.

The evidence, although identifying an audit during contract period for each year as of June 30th, was confined solely to audit procedure for year ending June 30, 1945. The record so made places plaintiff's case, as of the hearing, under three headings: (1) that merchandise, principally piece goods, was undervalued in the audit; (2) that shipments of merchandise were not made according to the regular course of defendant's business prior to June 30, 1945, but held in large volume until the morning of July 1, 1945, with result the merchandise in the shipments was carried on the inventory of June 30, 1945, as merchandise on hand and was priced at cost or lower, rather than being represented in financial statement under accounts receivable at the higher invoice price; and (3) that excessive amounts were set up as reserves. These charges, or any one of them, if true, reduced the net profits for fiscal year ending June 30, 1945, and in turn plaintiff's bonus.

Plaintiff's right to recovery must accrue under the written contract. The term "net profits" as used in the contract has a restricted meaning. We find no ambiguity in the language used. We pass to a consideration of the issues in light of the rule—plaintiff has the burden of proof except on the counterclaim.

I. Plaintiff's charge that merchandise was undervalued in inventory, for June 30, 1945 audit, relates principally to piece goods. Defendant priced its inventory at cost or market, whichever was lower. In taking the inventory defendant classified piece goods on hand as "old" and "new". Old piece goods identified materials left over from production of current or past lines. New piece goods were materials purchased for a future line. Plaintiff takes issue with the method of defendant in determining what was "old" piece goods and the resultant determination of the market on such merchandise.

These terms "old" and "new" are generally used in the garment industry to classify merchandise in the same manner defendant employed them. New piece goods were inventoried at approximately cost. Old piece goods were valued at their estimated market by defendant—usually about 50% of cost. This method and policy of pricing piece goods was consistent with the custom and practice of the trade, and was consistent with defendant's custom and practice in years past.

Plaintiff's principal objection to the inventory is that defendant's records show some of the mill numbers inventoried as old piece goods on June 30, 1945, were the subject by mill number of additional purchases by defendant during July and subsequent months of 1945. Plaintiff argues such items should have been inventoried at cost or market based on repur-

chase price. The weakness of the record to support plaintiff's position is that although bearing the same mill number such piece goods come in different colors, and color determines the usefulness and value of the product. There is no evidence any identical piece goods, color considered, inventoried as "old" was repurchased. There is no evidence any specific article of piece goods inventoried as of June 30, 1945, would have been inventoried at a higher price by one acquainted with and in good faith following the practice and customs of the garment industry, or that defendant varied from its custom and practice.

██ The contract provides net profits shall be determined by the audit made by defendant's auditors. Of course this carries with it the implication of a fair and honest audit, made in good faith.[1] The evidence does not show unfairness, dishonesty, or bad faith, on defendant's part, in preparing the audit.

██ There is a further presumption that the audit to be made by defendant's auditors would be consistent, that is according to the custom and practice in defendant's business and that of the industry in which defendant was engaged.[2]

██ Plaintiff had long been active in the ladies ready-to-wear business when he signed contract with defendant. We believe it reasonable to conclude he knew the customs of the trade. There is evidence he was informed specifically of defendant's custom and practice in pricing inventory. The parties are bound by their contract and its terms, express and implied, must be given force and effect. We cannot rewrite the contract.[3]

██ Plaintiff strenuously argues the audit does not meet the requirements of Internal Revenue Code relating to income tax. The petition does not contain this assignment. Assuming, but not deciding,

defendant was required to make its audit in accordance with the Internal Revenue Code, relating to income tax, 26 U.S.C.A. Int.Rev.Code, § 21 et seq., we find the record will not sustain plaintiff's claim that defendant did not. The section of the Code relied upon by the plaintiff reads:

"Sec. 29.22 (c) 2. Valuation of Inventories.—Section 22 (c) provides two tests to which each inventory must conform:

(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and

(2) It must clearly reflect the income."

Following the regulation appears this explanatory note: " * * * inventory rules * * * must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with these regulations."

As we read the regulation it places emphasis in taking an inventory for tax purposes on (1) conformation to the best accounting practice in the trade, and (2) consistency of such practices from year to year, and "greater weight" is to be given to consistency than to particular method of inventory if the method is in substantial accord with the regulations. We repeat, the weight of the evidence is defendant followed the practice of the trade in pricing its inventory and the inventory is consistent with the practice of the defendant. There was introduced over plaintiff's objection the report of the Internal Revenue Bureau approving the 1944-45 tax return of defendant. Plaintiff in his brief states it "has been accepted". It is presumed

---

[1] See 1946 Annual Survey of American Law—Contracts—p. 632.

[2] Morrow v. Missouri Pacific Ry. Co., Springfield, 1909, 140 Mo.App. 200, 123 S.W. 1034; Publishers: Geo. Knapp & Co. v. Culbertson et al., 1910, 152 Mo. App. 147, 133 S.W. 55; Western Union Telegraph Co. v. Brown, 8 Cir., 1923, 294 F. 167.

[3] 12 Am.Jur. p. 517—"Contracts—Binding Effect of Words and Acts"; State v. Hughes, 1941, 348 Mo. 125, 152 S.W. 2d 193; Penn v. Brashear, St. Louis, 1896, 65 Mo.App. 24; Longmire v. Diagraph-Bradley Stencil Mach. Corp., St. Louis Ct.App.1944, 176 S.W.2d 635.

public officers perform their duties in accordance with the law, until the contrary is shown.

◼ Plaintiff urges 1945 was a seller's market, anything in wearing apparel had a ready sale and defendant should have, but did not, recognize this situation in pricing its inventory. All parties now agree 1945 was a seller's market, but knowledge the industry had of the market at the end of 1945 cannot be charged either to the industry or defendant on June 30, 1945. The garment industry is a hazardous one, in contemplating styles and future retail sales. The weight of the testimony is that on June 30, 1945, defendant had no assurance or way of knowing the seller's market would continue. Had the market broken and as a result had defendant been compelled to take further loss on merchandise inventoried on June 30th, defendant could not be heard to ask plaintiff to refund on the loss on inventory because defendant failed to anticipate the market correctly. The question of inventory returns to—what is the custom and practice of the trade and has it been consistently followed. If in good faith these norms are observed by defendant the contract is complied with.

◼ Reasoning from the premise, the June 30, 1945 inventory, excepting the withholding of orders, was in substantial accord with defendant's policy in pricing merchandise for inventories in previous years, then plaintiff reaped the benefit of defendant's conservative valuation in inventory price of piece goods during the first two years of the contract period, which was also a seller's market. To permit plaintiff at the end of the contract period to change defendant's policy in making inventories to plaintiff's advantage for one year by raising the inventory valuations, after plaintiff had received the profits during the first two years of the contract resulting from defendant's conservative inventory prices, does not appeal to this Court as equity.

Other than to show a sound financial condition evidenced by a conservative statement, defendant could have no motive in reducing inventory values on June 30, 1945. Plaintiff and defendant then contemplated a renewal of the contract. To hold it was done for tax purposes, as suggested by plaintiff, is to enter the realm of speculation. The record is barren of any evidence of the tax reduction upon which defendant could have based its action. Hope of tax reduction is eternally with the taxpayer but it rarely materializes, at least so rarely we are unable to recognize any substance in wishful-thinking alone.

Plaintiff has failed to carry his burden of proof on this issue.

◼ II. Undervaluation is charged in inventory of dresses in delayed orders shipped on July 1, 1945. The underlying facts with reference to this transaction are undisputed. For some period of time prior to July 1, 1945 defendant had taken orders for ladies ready-to-wear garments with shipping date not later that June 30, 1945. In the trade this means orders shipped prior to stated delivery date are non-cancelable. On June 30, 1945 these orders totaled 7,744 dresses. They were then packed for shipment, packages addressed to respective customer-purchasers, and express receipts prepared for signing. Each shipment contained an invoice for the dresses enclosed. Total invoice price on the 7,744 dresses was $74,219.84. These dresses appear in the June 30th inventory at $37,109.92. June 30, 1945 was Saturday. At defendant's request the express company called at defendant's place of business "early" Sunday, July 1st, when all shipments were delivered to it. What had appeared on defendant's inventory of June 30th as dresses priced at $37,109.92 on July 1st became accounts receivable of $74,219.84. Plaintiff claims he is entitled to bonus based on the net profits of the transaction represented by the difference between inventory price and sale price.

The evidence does not sustain plaintiff's claim that the purpose of this transaction was to defraud plaintiff. The shipments were held as a result of a "M.A.P." regulation issued by the Office of Price Administration. By holding the shipments until July 1st, under the regulation, defendant could acquire a credit by virtue of which,

on sales of ladies ready-to-wear garments later in 1945, defendant would be authorized to charge a higher price than would have been permissible but for the credit so obtained.

The evidence indicates, under good accounting practice as long as the merchandise is in the possession of the seller it should appear in the inventory as merchandise. This was done. Defendant would justify the inventory price, below the sale price, as a fair market price, because of possible loss from returns since all orders were subject to return and cancellation because not delivered before June 30th.

There is no evidence of a return.

In order to give effect to the express provisions of the contract certain conduct by the parties must be implied as a condition of the contract, conduct necessary as a basis for performance of express conditions. Here we have a contract which binds plaintiff to perform personal service in connection with operation of plaintiff's business. Plaintiff's services are directly connected with sale of defendant's merchandise. Plaintiff's payment for services are partially based on sale of defendant's merchandise. Since plaintiff's compensation, in part, is based on yearly net profits the contract carries an implied obligation on defendant's part to make delivery of merchandise sold, in the usual and customary manner of defendant's business, to the extent defendant was able to make deliveries. It could not be implied the parties agreed defendant could breach its delivery agreements with customers, agreements which defendant had authorized plaintiff to make, for the sole gain of defendant, and plaintiff's loss. Defendant had never done so before June, 1945. In Watson Bros. Transportation Co. v. Jaffa, 8 Cir., 1944, 143 F.2d 340, loc. cit. 348, it was held: " * * * it is well settled that a contract includes not only the terms set forth in express words, but in addition all implied provisions indispensable to effectuate the intention of the parties and carry out the contract, and in the absence of which the contract could not be effectively performed. Sacramento Nav. Co. v. Salz, 273 U.S. 326, 329, 47 S.Ct. 368, 71 L.Ed.

663; New York Casualty Co. v. Sinclair Refining Co., 10 Cir., 108 F.2d 65, 69; Montrose Contracting Co. v. Westchester County, 2 Cir., 94 F.2d 580, 582; American Central Insurance Co. v. McHose, 3 Cir., 66 F.2d 749, 751; Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 107 F.2d 350, 353; Williston on Contracts, Sec. 1293 et seq.; see Cornell Law Quarterly 615; 23 Minn.Law Rev. 189. In determining whether the principle is applicable, the nature of the contract, the circumstances under which it was made, the situation of the parties and the objects they had in view in making the contract should be considered."

■ We think it probable defendant's action in holding large shipments of merchandise until July 1st, contrary to its custom, its usual course of business and agreement with purchasers, to increase deliveries for the second half of 1945 and thereby be in a position by virtue of such deliveries to charge a higher average price for sale of garments under maximum average price regulation than would have been possible but for such action, was a violation of the spirit if not the letter of Office of Price Administration regulations. We know of no regulations that authorized the action. It would be more correct to say it was permitted. But we will not venture into the jungle of administrative regulations of the dress industry. We conclude plaintiff's position should be sustained under terms of contract sued on. Plaintiff's right to a bonus on this transaction results not from a fraudulent or dishonest audit as charged—the evidence shows neither—but from a deviation by the defendant from the usual course of transacting its business. Plaintiff denies any knowledge of the plan to delay orders until July 1st for the purpose of defendant's reaping benefit under maximum price regulations. It would be contrary to reason to believe plaintiff would agree to have his bonus destroyed, or partially so, by defendant's action.

■ In arriving at net profit on the July 1st shipments there should be deducted the trade discount of 8% and the salesman's commission of 7½%, and defend-

ant's income tax. Plaintiff excepts to income tax deduction. Defendant was in the 85% bracket for the year 1944–45 and we deduce from the testimony this rate of tax covered the entire period involved in this case. Plaintiff did not attempt to cross-examine any of the witnesses who testified on the subject. Plaintiff's position is, the 1944–45 tax return based on defendant's audit at the end of fiscal year June 30, 1945, "is a closed matter so far as the Treasury Department is concerned". Plaintiff would charge the tax to the year "during which payment is made". A short answer to plaintiff's position is that it flies in the teeth of the express terms of the contract defining net profits. In allowing plaintiff bonus on net profit from sales of July 1st delivery of dresses we are proceeding on the basis, if defendant had made delivery in the usual and ordinary course of business the dresses would have been delivered on or before June 30, 1945, and the audit would have shown the invoice price as accounts receivable, rather than merchandise, in the inventory, and had that been done the tax would have been paid and no question about tax reduction would have been raised. The effect, although not the basis of our conclusion, is to reconstruct the audit.[4] The tax on the transaction even if paid at a later period, nevertheless in fairness and justice should be deducted in arriving at the true net profit on the transaction.

III. The reserves set aside for bad debts conform to the custom and practice in the garment trade. In fact the weight of the evidence is, they are lower than is customarily set up for the purpose. They run 9.54% for 1942; 3.73% for 1943; 3.18% for 1944; and 3.45% for 1945, of accounts receivable. No sum was added to this reserve for 1944–45, and no charge against profits for that year. This reserve was approved for tax purposes by examiner of Internal Revenue Bureau. Plaintiff's accountant witness alone testified they were higher than was "necessary", based on credit losses for certain

months. He was not acquainted with the custom in the trade. He testified different accountants could honestly differ as to whether the amount set aside was reasonable. We find no merit in this contention by plaintiff.

There was pending on June 30, 1945, a suit against defendant for $5,500, based on a claim for services. Against this contingent liability defendant set up a reserve, out of profits for year ending June 30, 1945, of $3,500. The suit was later settled; total cost of settlement, including expenses, was $2,000. What portion, if any, of $3,500 reserve shown on June 30, 1945 audit was later allocated to profits of that year is not clear from the record. At least $1,500 would be due. The Treasury Department disallowed the reserve of $3,500 for tax purposes. We conclude it was an erroneous interpretation of the contract that resulted in the charge of $3,500 to the reserve for this case and there should be charged against the business for year ending June 30, 1945, for purpose of determining net profits, only such portion of the settlement as reflects a liability incurred during that year, and plaintiff is entitled to his bonus on the difference between that sum and $3,500, less tax. This reserved item resulted from an emergency. It was not contemplated or known to the parties at the time of executing the contract. The most that could be implied would be that each year's business should carry that year's liabilities —not liabilities of other years. If plaintiff's bonus can be whittled down by reserves for such emergency purposes, with no recoupment on ascertaining the actual loss, then his entire bonus could be eliminated by a suit against defendant for a sum equal to the net profits for any one year, even though by subsequent settlement of the suit at a small percentage of the amount sued for a net profit would be revealed on crediting the unused reserve to profits for the year from which it was taken.

IV. Plaintiff insists a referee should be appointed to audit defendant's

---

[4] The rule is, the amount that would have been received by plaintiff had the business been operated as contemplated by the contract is the measure of his

recovery. (Benjamin v. Hillard, 64 U.S. 149, 23 How. 149, 16 L.Ed. 518, loc. cit. 522; Blair v. United States, 8 Cir., 1945, 150 F.2d 676.)

records. Plaintiff testified he knew defendant took inventories on June 30th of each year. He is charged, therefore, with knowledge that they were taken at that time. Under the contract he had a right to be present when they were taken. Therefore, we are not impressed with the complaint that defendant failed to invite plaintiff to take part in making the inventory. Plaintiff stood by during three yearly inventories, made no objection that they were taken in his absence, or the manner in which they were taken. He accepted his bonus based on them. Not until failure to agree on a new contract, six months after the last inventory, did plaintiff raise any question regarding them.[5] Then it was a blanket charge of various irregularities—"expense items overstated"; "cost of sales"; "cost of direct labor, wages and contractors, the general administration and overhead cost and other costs were all overstated"; "no effect was given to refunds of excess profits taxes"; in addition to undervaluing of inventory and excess reserve accounts. After suit was filed plaintiff was given access to defendant's books and records and conducted such examination, through Ernst & Ernst, certified public accountants, as they chose. Following this investigation only the items discussed under heading I, II and III were brought before the Court. Each of them we can dispose of without a reference. Our conclusion on neither results from a finding of bad faith or error in making any audit. No evidence was offered upon which the Court could base a conclusion that a referee would or could discover further facts in plaintiff's favor. Cost of a reference would be substantial. Unless of the opinion it would produce results favorable to plaintiff, we are loath to make an order entailing such an expense. Authorities cited by plaintiff do not authorize a reference as a matter of right under these circumstances.[6]

We will reopen the case solely to hear testimony on settlement of the litigation, for which the $3,500 reserve was set up, to determine proportion of settlement cost chargeable to year ending June 30, 1945. If there is any question on amount of tax paid on profits for same period, evidence may be offered on that issue, otherwise the record is closed.

We find no substantial evidence of violation of the contract by plaintiff as charged by defendant. Defendant has not briefed the point. Every one seems to have been satisfied with the arrangement until well after the contract expired. It was only after a law suit was filed that charges and counter-charges were made. Law suits breed such beliefs in the minds of litigants but they must be supported by something more than ill will caused by litigation.

### Counterclaim

■■ Defendant's counterclaim strikes at plaintiff's drawing six checks on the subsidiary corporation in New York for $250, one for each month commencing with July and ending with December, 1945. Plaintiff defends his action by asserting the checks represented part of his salary, by agreement with defendant made through its stockholder Mr. Stein. Mr. Stein's authority to make such agreement is not challenged, but he denies making it. Plaintiff continued to receive, for remainder of the year, a check from defendant's St. Louis office for $1,000 monthly, because "no one notified the bookkeeper to discontinue" sending them. Plaintiff and defendant's representatives had a number of conferences during the period and discussed terms for a new contract but were unable to reach agreement when plaintiff

---

[5] This is persuasive evidence that the audits were made in the manner contemplated by the parties. See Floyd v. Ring Construction Co., 8 Cir., 1948, 165 F.2d 125.

[6] Before making a reference there must be some evidence to show the necessity for it, probable cause to believe the plaintiff can sustain his charge in whole or part. (1 C.J. p. 642—Determination of Liability to Account; 1 C.J.S., Accounting, § 40; 10 R.C.L. p. 510—Reference as Matter of Discretion; 1 C.J. p. 624—Accounting for Commissions and Profits; 1 C.J.S., Accounting, § 25; McCarthy v. Gordon, 1912, 211 Mass. 115, 97 N.E. 88; Columbian Equipment Co. v. Mercantile Trust & Deposit Co., 5 Cir., 113 F. 23, loc. cit. 25.)

terminated their relation December 31, 1945 by letter of resignation. The record does not sustain plaintiff's contention that he had an agreement for definite compensation during the last half of 1945. We find there was no agreement. Plaintiff continued to work for defendant, performing the same services as under the contract except the failure to prepare the usual number of samples for early 1946 showing. Under this situation, as we understand the law, plaintiff was entitled to compensation based on the reasonable value of his services.[7] On this theory neither party offered any evidence. The value of services for last half of 1945 bears some relation to the amount paid plaintiff for the first half of 1945. We have some aid in disposing of the claim by examination of the trial balances sent by plaintiff to defendant each month. They show plaintiff drawing $250 per month as salary. Some of defendant's officers denied seeing the trial balances but defendant is charged with knowledge of their contents. No objection was made to this action of plaintiff until this suit was instituted. We can only conclude, pending a new contract plaintiff was entitled to a salary of $250 per month from the New York corporation in addition to $1,000 per month from the Missouri corporation as reasonable for his services. Failure of defendant to object, at the time, evidences acquiescence. We are not unmindful the parties were negotiating for a new contract and wages could have been adjusted in it. It is difficult to believe either party expected a refund from the employee as a result of any contract. The amount received by plaintiff approximates compensation he had been receiving, including bonus, during the contract period. It might be argued plaintiff's compensation for the last half of 1945 should be less than for the first half because of his failure to prepare a full line of styles for 1946 showing. Plaintiff did prepare some style numbers. There is no evidence of cost to defendant of preparing additional numbers nor any basis on which the Court could calculate a reduction in compensation for such reason. The record on this question is not complete but we are left with no alternative but to decide the issue on the evidence, such as it is. Defendant failed to sustain its burden of proof on this issue.

---

[7] United States, for Use of Susi Contracting Co., et al. v. Mara Contracting Co., 2 Cir., 1944, 146 F.2d 606; Pope Hartford Motor Car Co. v. Farley, St. Louis Ct.App.1916, 185 S.W. 732; Baker v. Pulitzer Publ. Co., St. Louis, 1903, 103 Mo.App. 54, 77 S.W. 585.