RANDOLPH FOODS, INC., plaintiff, v. E. H. MCLAUGHLIN, HOWARD RANDOLPH and CENTRAL IOWA POULTRY AND EGG COMPANY, INC., defendants.

HOWARD RANDOLPH, plaintiff, v. E. H. MCLAUGHLIN, defendant, and RANDOLPH FOODS, INC., defendant to cross-petition.

No. 50059.

1260

June 12, 1962.

Frank R. Thompson, of Guthrie Center, and Walter R. Brown, of Des Moines, for appellants.

Taylor & Taylor, of Guthrie Center, and Steward, Crouch & Hopkins, of Des Moines, for appellee.

THOMPSON, J.—The first impression gained from a survey of the record in this case is that there ought to be a better way for the parties to settle their differences. The printed record contains 2128 pages, and there are many hundreds of pages of briefs and arguments. This, perhaps, while unusual, would not be so striking were it not for the fact that after the issues which were tried in a hearing lasting over one month in the district court have finally been determined, many others remain for decision in another trial.

An added complication is found in the fact the parties are not agreed upon what was actually tried and determined below. The trial court itself was in some doubt as to this; so that after entering judgment in accordance with its findings of fact and conclusions of law, upon its own motion it amended the order a few days later and eliminated the judgment. This brings about one of the much disputed questions upon the cross-appeal.

The pleadings are voluminous. The parties attacked and counter-attacked at length, leaving no word unwritten which could by any possibility be thought to aid their respective cases.

As one able trial court, who made many preliminary rulings, remarked, it seemed to be a matter of principle for each side to contest whatever the other suggested or offered or was willing to agree to. The result has been a most difficult problem both for the trial court and ourselves.

I. What has been tried to date, and is involved in this appeal, is an accounting procedure, in which the original defendant in each case, McLaughlin, is in effect the plaintiff by virtue of his cross-petitions. Involved are two actions, Nos. 15312 and 15313 in the Guthrie District Court. The first was commenced on September 9, 1955, by Randolph Foods, Inc., against the defendant McLaughlin, asking damages for breach of a contract of employment. The second was started on September 15, 1955, by Howard Randolph, the president and chief stockholder of Randolph Foods, Inc., but in his individual capacity, seeking to recover rentals under a lease contract with McLaughlin covering a house in Guthrie Center.

Each suit brought from McLaughlin an answer and cross-petition. By cross-petition also McLaughlin brought in Central Iowa Poultry and Egg Company, Inc., as a third-party defendant. Replies were filed to the cross-petitions, with many amendments to various pleadings. The cross-petitions against Randolph Foods, Inc., and against Howard Randolph individually, in cases Nos. 15312 and 15313 respectively, alleged that McLaughlin was entitled to a 25% share of the net income of the corporation Randolph Foods, Inc., for the period from July 1, 1954, to August 29, 1955, during which time McLaughlin was employed by the corporation under a contract of employment negotiated with and executed by Howard Randolph personally. An accounting of the net income was asked in each case. The cross-petition against Central Iowa Poultry and Egg Company, Inc., hereinafter referred to as CIPE, alleged it was a wholly owned subsidiary of Randolph Foods, Inc., and its profits were in fact the profits of that corporation, which will hereinafter be known as Foods. Howard Randolph will be referred to as Randolph.

The contract between Randolph and McLaughlin was executed under date of March 26, 1954. A copy was attached to plaintiff's petition in case No. 15312, and it appears in the record

as Exhibit D-1. Space does not permit setting it out in full, but pertinent provisions will be referred to as they become material hereinafter. It provided that Randolph would incorporate his business then being operated by him at Guthrie Center, Iowa, as of July 1, 1954; that McLaughlin would be employed by the corporation as assistant general manager at a salary of $12,000 per year, plus a bonus of 25% of the net income of the corporation, to be computed after setting aside $20,000 annual salary for Randolph and taxes; and the term of McLaughlin's employment was to be for five years from July 1, 1954.

Foods' petition in case No. 15312 alleged breach of his employment agreement by McLaughlin by leaving the corporation on August 29, 1955, and in a separate count that he had removed certain papers and records of Foods. Damages were asked in each count. The contract also provided that Randolph would construct a residence for McLaughlin in Guthrie Center, for which the defendant would pay rental of 10% of the cost. Case No. 15313 alleged the defendant had removed from the house and refused to pay rental after September 1955 and asked judgment for unpaid rentals. McLaughlin also asked in his cross-petitions for judgment for alleged unpaid salary for some weeks immediately prior to August 29, 1955, when he left Foods' employ. It was recognized that the matters referred to in this paragraph are law issues and they still remain for decision. Nothing said in this opinion is intended to have any significance as to what those decisions should be.

II. It is important first to decide exactly what was tried and decided in the long hearing which has already been had. Without question it was concerned solely with the accounting demanded by McLaughlin, both against Foods, case No. 15312, and Randolph, in No. 15313. Whether there is in fact personal liability on Randolph's part to account for 25% of the net income of Foods during the period from July 1, 1954, to August 29, 1955, is another question which must be the subject of a later division of this opinion. We shall here consider whether the trial court, having made its determination of the net income, should have entered a judgment therefor with execution withheld until the trial of the other issues reserved, as it first did; or whether

its second and final ruling, which withdrew the judgment and left its decision merely a finding of facts to be followed in the later trial, was correct. The question is raised by McLaughlin in his cross-appeal. It must be kept in mind that McLaughlin, although the nominal defendant in each case, is in fact as to the issue of accounting in the position of plaintiff. It is he who is asking for the accounting relief.

This division will be devoted to determining the disputed question of what in fact was tried. McLaughlin thinks the court was in error in setting aside the judgment first entered, and we are disposed to agree. The matter of exactly what was being tried was not made entirely clear; but we think it sufficiently appears that, as Judge S. E. Prall, who ruled on many preliminary matters, said at one point: "The effect [of a ruling then made] also will be to leave in equity only the proposition of accounting for the profits for the period the defendant actually worked under the contract upon which this cause of action is based." The record also shows this: "On November 4, 1957, the trial of consolidated cases commenced by taking evidence on the accounting phase of the case, the same being tried in equity * * *."

The accounting issues, so far as they pertained to the period McLaughlin was actually in employment, were thus tried in the action now before us. Accounting issues for future profits—that is, those which McLaughlin might have earned after August 29, 1955, if he had continued his employment for the full five-year period—are not involved here but are reserved with other issues.

The general rule is that the burden is upon one who claims a right to an accounting to prove such right. Meier v. Johannsen, 242 Iowa 665, 671, 672, 47 N.W.2d 793, 797, and citations. But here the duty arose from the contract of employment, Exhibit D-1. This contract was pleaded and relied upon by Foods; it was admitted and likewise relied upon by McLaughlin. In fact, in their opening statements counsel for Foods and Randolph in substance admitted a duty to account. This was no more than making a virtue of necessity. In fact, the court had no right to try the accounting until the duty to account was established; and it appears that all parties in effect conceded such duty rested

upon the plaintiff—the defendants in the accounting actions—
by proceeding to try that issue. It is not too much to say that
all rights of all parties depend upon Exhibit D-1 and its liabil-
ities or breaches.

■ The burden of accounting, as above stated, generally is
upon the one who asks an accounting. But there is a well es-
tablished exception to this rule. The duty falls upon the de-
fendant in an accounting action when the proceeding is in the
nature of a discovery; that is, when the proof is peculiarly in
the knowledge of the defendant and the plaintiff does not have
adequate or equal means of producing it. Meier v. Johannsen,
supra. It is evident in the case before us that Foods and Ran-
dolph had control of the books of Foods, and McLaughlin did
not. The means of accounting was in the hands of the defendants
in the accounting action—that is to say, of Foods and Randolph.
The defendants in the accounting phases of the actions—Foods
and Randolph—urge that the trial having been in equity, the
trial here is de novo; and further, that although the records were
all in their possession and had been kept by them and so it may
have been their duty to produce them, this having been done the
burden remained on McLaughlin, the plaintiff in accounting, to
show his right to recover. That is to say, the burden of going
forward with the evidence may have devolved upon Foods and
Randolph in the first instance, but the burden of proof did not
shift. We need not determine this point. Since we find that,
regardless of the locus of the burden of proof, McLaughlin is
entitled to recover in some amount, the question has no signifi-
cance.

■ It would have been error for the court to try the ac-
counting before McLaughlin's right to it was established. Benson
v. Charles Weitz' Sons, 211 Iowa 489, 494, 231 N.W. 431, 433.
So, having, properly as we think, held that the right to an ac-
counting was established, if not conceded, the court after trying
the accounting should have entered a judgment in accordance
with its findings. This judgment should not be subject to exe-
cution until the other issues are determined and possible offsets
established and deducted. It should be entered against Randolph
Foods, Inc. As to CIPE, the trial court dismissed the cross-

petition against it, and no appeal is taken from such ruling. Whether the judgment should also be entered against Howard Randolph is the subject of one of the assigned errors on the cross-appeal, and we next turn to this question.

III. The liability of Randolph depends not only upon applicable principles of law, but a proper construction of the contract, Exhibit D-1. The terms of the contract proper clearly impose a personal liability on Randolph for the carrying out of the employment agreement. At the time the contract was entered into, March 26, 1954, Randolph was carrying on his business as a personal, unincorporated enterprise. The contract provides that he would incorporate on or before July 1, 1954, himself retaining and controlling a majority of the capital stock. The language of the contract is that Randolph was personally agreeing to do the various things upon which McLaughlin relies. Thus, he agreed to employ McLaughlin at a salary of $12,000 plus an annual bonus of 25% of the net income of the corporation to be formed; and "to so continue to employ Party of the Second Part [McLaughlin] under the terms and conditions of this agreement for a period of five (5) years from and after July 1, 1954 * * *." It is at all times Randolph personally who agrees to the terms of the contract and binds himself to them. Thus section (a) of paragraph 3, which contains most of the specific agreements of Randolph, says: "* * * to pay Party of the Second Part a salary of Twelve Thousand Dollars ($12,000) per year * * * and in addition thereto, to pay to Party of the Second Part an annual bonus of twenty-five per cent (25%) of the net income of said corporation * * *."

It is true the corporation was not organized at that time, and could not enter into a contract. But Randolph made his promises personal. Having prospective and agreed control of the new corporation, he promised to pay McLaughlin certain sums, including the 25% of net income now in controversy.

McLaughlin on his part agreed to enter the employment of the corporation to be formed and "to accept for services to be rendered" the same amounts and percentages set forth above. But these sums and percentages were promised by Randolph, not by the corporation. The net result of the entire agreement

is that Randolph employed McLaughlin to act as assistant general manager and secretary-treasurer of a corporation to be formed by Randolph, and agreed to pay him a certain yearly salary plus a percentage of the net income of the corporation; and McLaughlin agreed to enter the service of the corporation and to accept pay according to the terms of the contract, which is to say, from Randolph.

■■ The question for determination here is whether McLaughlin agreed to accept the corporation's liability in lieu of that of Randolph, when the corporation was formed; and this must be determined from the terms of the contract itself. It is well settled that one who purports to act for a corporation to be formed is personally liable on his contract unless the other contracting party has agreed to look to the corporation for payment. King Features Syndicate v. Courrier, 241 Iowa 870, 875–877, 43 N.W.2d 718, 722, 723, 41 A. L. R.2d 467, and citations. Promoters are liable on contracts entered into personally, even though they later form a corporation which adopts and receives the benefits; unless there is a novation by which the other party to the contract agrees to accept the agreement of the corporation in place of the original contract. 18 C. J. S., Corporations, section 132, page 532.

■ We have pointed out above that McLaughlin, while he agreed to enter the service of Foods, made no further agreement as to compensation but merely agreed to accept it as provided by the contract with Randolph, in which Randolph agreed to make payment. There is, however, one further fact which must have attention. This is a letter, dated March 25, 1954, addressed to Randolph by McLaughlin. It refers to the agreement D-1 and seems to have been intended as an addition to or clarification of it. D-1 is dated March 26, 1954; but it is clear it was already in effect, or at least drafted, when the letter of March 25 was written. The letter refers to "the agreement we have entered into whereby I am employed by you" and says that while the salary is to be the stated sums of $12,000 per year plus 25% of the net income of the corporation "you have personally guaranteed that I will never receive less than $15,000 per year, that is to say, that if there should be no profit in the business for any one year,

you will personally pay to me $3000, being the difference between $12,000 and $15,000, and in like manner, if in any year the net income which I receive * * * yields an amount which will be less than $3000, to that extent you will make up the difference between my guaranteed salary of $12,000 and $15,000. Of course, in any year in which the 25% of the net income which I am to receive shall equal or exceed $3000 there will in that event be no obligation on your part to pay any portion of the $3000 guaranty."

This letter was signed by McLaughlin and endorsed by Randolph "The foregoing is a true and correct statement of our agreement and understanding." Counsel for Randolph think this shows that McLaughlin accepted the corporation's liability on the contract D-1 as a novation, thereby releasing Randolph. But as we read it, it amounts to no more than a guarantee that the 25% of the net income which Randolph had promised to pay in D-1 would amount to at least $3000, so that McLaughlin's total salary would be not less than $15,000. It has no other bearing on the agreement D-1. We must conclude that Randolph has obligated himself to pay McLaughlin's compensation as set out in D-1, subject of course to any offsets which may be determined, and the judgment on the accounting should be against him personally as well as against Foods; with the same restrictions as to withholding execution until trial of the remaining issues.

IV. Another controversy arises over the holding of the trial court that the profits of CIPE were in fact profits of Foods, and McLaughlin is entitled to recover 25% of the net profits of both corporations. Some further statement of facts is required.

On October 30, 1954, Foods purchased the entire capital stock of CIPE for the sum of $500. This was paid from the funds of Foods, although the stock was endorsed to Randolph. CIPE was at the time a corporation at Marshalltown engaged in the same business as Foods, but not so successfully. It was heavily in debt. From that time on CIPE was operated by Foods, and there was a considerable transfer of assets between the two corporations at various times. McLaughlin was consulted about the purchase at the time it was made, and he agreed to, and did, devote considerable time and effort to the business of CIPE. The

$500 paid by Foods for the stock of CIPE was carried on the Foods' books as an asset until March 1956 when it was transferred to an account known as "Officers Accounts Payable." This was after McLaughlin's cross-petition asking an accounting herein had been filed, and was an attempt to make it appear that instead of the stock being an asset of Foods it was a charge against Randolph individually. On December 16, 1955, a letter, signed "Howard Randolph, Howard Randolph, President Randolph Foods, Inc., Central Iowa Poultry and Egg Company, Iowa Egg Products, Inc." was sent to dealers, which contained this language: "Randolph Foods, Inc. at the present time owns all of the stock of Central Iowa Poultry and Egg Company at Marshalltown and will own all of the stock of Iowa Egg Products Company (if that is the name for our Des Moines branch). This means that the stockholders of Randolph Foods, Inc. own Central Iowa Poultry and Egg Company and Iowa Egg Products Company the same as though they held stock of those companies individually."

The trial court dismissed the cross-petition against Central Iowa Poultry and Egg Company. No appeal has been taken from this judgment, and so we are not concerned with it here. But this does not dispose of the question whether its profits were in fact profits of Randolph Foods, Inc., within the meaning of the contract between the parties, Exhibit D-1. The general rule is that the mere fact that one corporation owns all the capital stock of another does not make either liable for the debts of the other. But if the parent corporation uses the subsidiary so as to make it a mere agent, or if such control is exercised in such a way as to injure a third party, the two corporations are considered as one for some purposes. Gledhill v. Fisher & Co., 272 Mich. 353, 262 N.W. 371, 102 A. L. R. 1042, 1045, and annotations.

We think the proper rule is well expressed in Platt v. Bradner Co., 131 Wash. 573, 579, 230 P. 633, 635: "While, in general, a corporation is a separate legal entity, nevertheless when one corporation so dominates and controls another as to make that other a simple instrumentality or adjunct to it, the courts will look beyond the legal fiction of distinct corporate existence, as the interests of justice require; * * *."

In the instant case, McLaughlin was employed as assistant manager of Foods. When purchase of the nearly defunct CIPE was contemplated, he was consulted. He replied that he would be willing to "work night and day to get the business on its feet." He put in much time at Marshalltown in advancing the business of CIPE. It seems apparent that all parties considered the business of CIPE as merely an adjunct of Foods. McLaughlin was permitted, probably required, to devote much time and effort to building it up. An apparent understanding arises that at least as between McLaughlin on the one hand and Foods and Randolph on the other, profits of CIPE would stand on the same footing as those of Foods. One purpose of a profit-sharing contract between employer and employee is that the latter will have a more intense interest in seeing that a profit is made. If McLaughlin was not to share in the profits of CIPE it seems difficult to explain why he would have been required to devote so much effort to its affairs.

This thought brings the matter within the exception to the rule that both parent and subsidiary corporations are considered as one when the interests of justice require. Foods purchased 100% of the stock of CIPE; both were controlled entirely by Randolph; McLaughlin was consulted about the purchase of CIPE and gave much thought and energy to its affairs. We are convinced both Randolph and Foods, on the one hand, and McLaughlin, on the other, contemplated that the 25% provision in the contract would apply to the net income of CIPE as well as to that of Foods.

Randolph and Foods cite Akers v. J. B. Sedberry, Inc., 39 Tenn. App. 633, 645, 286 S.W.2d 617, 623. We do not find it in point. Under a similar profit-sharing contract to the one before us here, the Tennessee Supreme Court held that losses of a corporation whose stock was purchased by the Sedberry Company during the period of employment could not be deducted in computing the net profits in which the employees were entitled to share. After stating that the contracts fixed the rule for measuring the recovery and the purchase of the second corporation was not then contemplated, the court said that there was no satisfactory proof of parent and subsidiary relation. Also the court used

this language: "Nor was there any proof that J. B. Sedberry, Inc., as parent corporation, dominated or controlled the Jay Bee Manufacturing Company * * * as its subsidiary." The facts distinguish the Tennessee case from the one before us. The court correctly held that profits of CIPE during the period of McLaughlin's employment should be considered as profits of Foods.

V. We come next to the actual figures found by the trial court and the formulas by which they were reached. There is a wide difference between the parties both as to methods and results. Foods and Randolph think the court was in error in finding much more net income than was actually earned by Foods. There is not so much disagreement with the court's figures as to the net income of CIPE, if this is to be included in the profit of Foods, as we have held. We shall discuss this in later divisions.

McLaughlin urges that the court's finding of net income was inadequate. This also will be the subject of a later division. There are so many areas of disagreement with the trial court's holdings and so many figures involved that it will be impossible to discuss all of them within the reasonable limits of an opinion. We shall determine only the methods of computation and the results found which have some semblance of plausibility or merit.

VI. One of the points of controversy which is much argued concerns Exhibit No. D-33, a closing inventory submitted by Foods and Randolph for the year ending June 30, 1955. The trial court found this to be so unreliable and inaccurate that it disregarded it altogether, and resorted to the rule that it would adopt the next best, or best available, method of determining profits. Foods and Randolph, who will be hereinafter referred to as defendants, assign error on this ruling. We have examined the exhibit and the record pertaining to it, and are constrained to agree with the trial court. The inventory was not taken, or at least was not available, for some months after June 30, 1955. It was not shown to McLaughlin's expert accountant when he made his study of defendants' records. The nature of the inadequacies shown is made clear by the testimony of Dr. James M. Reinhardt, professor of criminology at the University of Nebraska. He is an examiner of disputed documents, and ap-

pears highly qualified as an expert on the matter to which he testified. He said that he had examined the inventory in question, and pointed out many alterations and erasures. As to some of these, he was able to identify the figures which had been first written in and then changed; at other points he was able to say only that erasures and changes had been made. The figures which he was able to identify and which had been erased were in almost all cases more favorable to McLaughlin, and so less favorable to defendants, than the substituted ones. There are other matters which tend to throw doubt on the accuracy, if not the good faith, of the inventory; but we content ourselves with holding that the trial court was well warranted in disregarding the inventory, and we follow its example at this point.

VII. The defendants in accounting do not seriously question that if the inventory, Exhibit D-33, is not to be considered, as we have held in the division immediately preceding, the court properly resorted to the next best method of computing the net income of Foods and CIPE. But they contend that such method was not used. The trial court found that the net income of Foods for the period from July 1, 1954, to June 30, 1955, inclusive was $108,119.56, and from July 1, 1955, to August 29, 1955, inclusive was $18,019.92; a total of $126,139.48; and that the net income of CIPE from the date of its acquisition to January 1, 1955, was included in the net income of Foods; and from January 1, 1955, to August 31, 1955, was $63,486.50. This made a total of $189,- 625.98 net income in which McLaughlin is entitled to a share of 25%, or $47,406.49, which was the final determination of the court.

Defendants urge that these computations as the income of Foods were reached by the consideration of incompetent evidence, to the admission of which they lodged proper objections. This evidence consisted of monthly profit and loss statements of Foods, and balance sheets. Most important is a balance sheet known as Exhibit D-19, an original longhand profit and loss statement prepared by Clyde Mitchell, who was during all the period covered by this controversy the bookkeeper for Foods. McLaughlin testified that this was handed to him by Mitchell eight or ten days after May 31, 1955. These statements were

largely relied upon by the trial court in making its computations. As to the following months, the court estimated the same profits per month as shown by D-19 and the previous monthly statements. If the statements were admissible, the court properly used the best available evidence rule in making these estimates, and again this formula is not seriously disputed.

But it is evident that the admissibility of the statements, particularly of D-19, upon which chief reliance seems to have been made, is of great importance at this point. Mitchell was no longer in the employ of Foods at the time of the trial. He is shown to have been in California and so beyond the jurisdiction of the court. His testimony, either in person or by deposition, was not offered. Defendants urge that the statements were not admissible as books or records of Foods, because they were not properly identified as such under our statutes concerning the admissibility of such documents. This may be conceded. But McLaughlin says they were admissible as admissions against interest. We agree.

The defendants contend that Mitchell is not shown to have been an agent of Foods who had authority to make any binding admissions. But it does appear without contradiction that he was employed as a bookkeeper, and that part of his duties was to make up the monthly profit and loss statements and balance sheets in question. At least on one occasion the statement prepared by him was handed to McLaughlin by Randolph. It seems inescapable that Mitchell was acting within the scope of his authority, in fact of his obvious duty, in preparing these documents; and that in so doing he was acting for the corporation.

We said in Grismore v. Consolidated Products Co., 232 Iowa 328, 335, 5 N.W.2d 646, 651: "It is also fundamental law that whatever an agent says or does, within the scope of his actual or apparent authority, is the act of and binds his principal." The same rule is also stated in 20 Am. Jur., Evidence, section 596; and we have followed it in many cases, including Amato v. Shebek, 233 Iowa 1088, 1091, 11 N.W.2d 387; Walters v. Iowa Electric Co., 203 Iowa 467, 470, 212 N.W. 886; and Ellison v. Stockton, 185 Iowa 979, 984, 170 N.W. 435. Defendants seem to be of the opinion that no one may bind a corporation by words or acts except an officer; but this is obviously a

mistake. A corporation may and often does act through an employee who is within the scope of his employment and authority. Such was Mitchell's position here.

VIII. Defendants predicate error on the computation of the trial court which made changes in their claimed expense for amortization, depreciation and repairs. The court allowed them $393.89 in excess of their claim for amortization; but reduced the depreciation by $2970.24, and the repairs by $13,703.85. This resulted in disallowing a net total of $16,280.20, and of course increased the net income by that amount.

There is a sharp disagreement between the expert accountants for the respective parties at this point. The controversy is largely whether the items claimed should be considered as expense incurred in the year paid or should be capitalized and depreciated over several years. Many of the items of repairs seem without serious question to have been actually expense incurred in new building additions to the company's plant. They are not repairs in any fair sense. A detailed consideration of the dispute here would involve long statements of facts and figures concerning many items, which would be of no benefit to the courts or legal profession and would unnecessarily lengthen this opinion. We content ourselves with adoption of the computation of the trial court, which seems fair at least to the defendants.

IX. Defendants complain that they were disallowed an item for management expense. They claimed this in the sum of $11,800, for the services of Howard Randolph as president and general manager. The trial court allowed nothing for this, as such; but he did allow a salary to Randolph in the sum of $20,000, which was not claimed. This was because of the provision in the contract, Exhibit D-1, which specifically said the net income should be computed after a salary in that amount was allowed. The court also allowed management expense for the services of McLaughlin during the time he was employed as assistant general manager in the sum of $8500. We think this was correct. We are not persuaded that the parties in making the contract, Exhibit D-1, contemplated further payments to Randolph either as salary or management expense, which would be salary, than the $20,000 specified in the agreement.

 X. The accounting defendants assign error on the failure of the court to make allowances for additional income taxes both for Foods and CIPE. The argument made is this: Income taxes as allowed by the trial court in computing the net income in which McLaughlin is entitled to share were those actually paid. If there was additional income, as the court found, additional income taxes should be paid upon it, and the amount of such taxes should have been estimated by the court in accordance with percentages fixed by the income tax laws of the United States. These would be quite substantial, and so would reduce the amount to which McLaughlin's percentage would entitle him.

The point is ingenious, and not free from difficulty. But we conclude it is not well taken. There is no showing the income tax returns of the two corporations have been challenged by the Internal Revenue Department of the United States Government. The returns have been accepted, and before this case was determined by the trial court the three years provided by the statute of limitations of the revenue code had elapsed as to all returns here involved. This statute does not apply, of course, in cases of fraud, but there is no evidence any claim of fraud is made by the internal revenue authorities. So far as the record shows, the income tax returns have been accepted as final.

In fact, the methods of accounting for income tax purposes and those proper in determining other questions, such as an employee's share under a profit-sharing contract, are not necessarily the same. It may be that the internal revenue service takes a different view of some of the matters discussed above, such as the admissibility and correctness of the inventory, or the allowance or disallowance of other items, than we have found proper. At least there is no showing that any claim for additional tax has been made or that any will be made. What may or may not be satisfactory to this court in the way of an accounting may or may not be satisfactory to the income tax authorities. They are not bound by our determination. See Morehouse v. John M. Kelly Contracting Co., 95 N. J. Eq. 280, 282, 283, 122 A. 374, 375; Harvey v. Missouri Valley Electric Co., Mo., 268 S.W.2d 820, 821, 822. The latter case raises an interesting question which shows the fallacy of attempting to estimate any change in

the income tax situation here, rather than resting it on the tax actually paid as did the court. It is pointed out by the Missouri Supreme Court that bonus payments to employees as compensasation for services is a business expense, and so deductible from gross income. The court said: "Income taxwise, defendant's argument is sound." Loc. cit. 268 S.W.2d 821. The court then went on to hold that such a deduction was not proper in estimating the profits in which the employee was entitled to share. We have no occasion to determine whether McLaughlin's percentage might be used by the corporations as a business expense deductible for income tax purposes; we cite the authority only to show that there is often a considerable variance between proper accounting procedures for different purposes. The defendants cite and rely upon Pollack v. Carlye Dress Corporation, Dist. Ct., E. D. Mo., 76 F. Supp. 755, 759. There the plaintiff in the accounting action urged that the defendant's audit was not made in accordance with the Internal Revenue Code. The trial court said only: "Assuming, *but not deciding*, that defendant was required to make its audit in accordance with the Internal Revenue Code, relating to income tax, * * * we find the record will not sustain plaintiff's claim that defendant did not." (Italics supplied.)

To uphold defendants' contention at this point would be to deny McLaughlin his percentage because of purely speculative additional income taxes which there is no evidence will ever be required or paid.

XI. While Proposition III of Division III of defendants' brief states: "The Court erred in its determination of the net profits of CIPE from the period of acquisition to February 28, 1955, and from March 1, 1955, to August 31, 1955," the argument under this heading begins: "Generally, the appellants agree with the trial court's determination of the CIPE profits during the period of McLaughlin's employment." It should be noted that the fiscal year of CIPE ended on February 28. This explains the reason the court computed profits until that date separately from those it found earned from March 1 to August 31 inclusive. Defendants' argument further says: "The trial court's findings on the profits for the fiscal period ending February 28, 1955,

perhaps cannot be successfully disputed by the appellants." As to the profits from March 1 to August 31, it is argued that since management expense was disallowed during that time federal income tax should have been computed and added. We have covered this contention in the preceding division. The court at this point adopted the rule previously referred to, that it would use the best available method of determining the profits of CIPE from March 1 to August 31, 1955, inclusive and determined it would take the method of CIPE's accountant as shown by Exhibit P-65, subject to certain stated adjustments which we find proper. The "best available method" was used by the court because there was no inventory taken for CIPE at the end of McLaughlin's employment and so an entirely accurate accounting could not be made. We think it properly adopted the method and figures of the accountant, with the adjustments it correctly thought should be made.

XII. We have decided above what we think to be the substantial contentions of the accounting defendants. Next we come to the claim of the accounting plaintiff, McLaughlin, that the court should have found the net income of Foods and CIPE to be greater than it did. We might be inclined to agree with the court's approach to the matters in which plaintiff thinks it was in error in this respect; but for reasons which we will endeavor to make apparent we do not reach these questions on their merits.

It is well settled that one who does not appeal may not have a more favorable result in the appellate court than he secured below. A party who does not appeal or who has not sought to have the judgment or decree reviewed by a cross-appeal or assignment of cross-errors may not have greater relief than that afforded in the trial court. 5B C. J. S., Appeal and Error, section 1835, pages 230, 231.

We are cognizant of the fact that the accounting plaintiff did in fact cross-appeal from all rulings, orders and judgments adverse to him. Such is the language of his notice of appeal. But this threw upon him the duty to proceed with his appeal in the manner and form prescribed by the Rules of Civil Procedure. Rule 344 provides: "(a) Appellant's opening brief shall contain: * * * (4) In separately numbered divisions:

(First) A statement of the 'error' or 'proposition' relied on and discussed in that division * * *." It is at this point that we find the cross-appellant's failure to comply. In general his brief and argument is excellently prepared and documented. He states eight "propositions argued", of which Number VI is that "the evidence establishes that the net profits of Randolph Foods, Inc., for the fiscal year ending 6-30-55 were in excess of $108,119.56 as found by the trial court." Subheadings under this, fourteen in number, are devoted to statements either that the court correctly allowed or eliminated certain items, or should have found greater amounts. But these propositions quite evidently refer to his answer to the contentions of the defendants. It was his right to contend that the trial court was not in error in finding the net income in at least the amount it did; even to the extent of attempting to show that the total should in fact have been greater.

But the difficulty arises from the fact that immediately following the heading "propositions argued" referred to immediately above comes the title "Cross-Appeal". Under this are stated two propositions only. Since they are important at this point, we quote them:

"I. The pleadings, evidence and entire record establishes that McLaughlin has an absolute and unconditional right to his proportionate share of the profits during the period of his employment subject only to any offset that may be established upon trial of the law actions.

"II. The employment contract was a personal undertaking of Howard Randolph and he is jointly liable with the corporation."

Our determination here is strengthened by the accounting plaintiff's repetition of his propositions at a later point in his brief, where he sets out "Propositions Relied on for Affirmance (and Modification)", under which he includes his contention that the findings of the court as to net income should have been greater; and following this he again states his "Propositions on Cross-Appeal", which are identical with the two quoted above. It is apparent that he is attempting to obtain a larger allowance by increasing the amount found due him, under the guise of "modifying" through propositions stated in answering the defendant's

appeal. The rule that he may not have a more favorable result than was had in the trial court without appealing prevents this; and we must measure his actual appeal by the propositions stated "on Cross-Appeal."

From this we can draw no other conclusion than that the only propositions urged in support of the cross-appeal are those stated under that heading. We have already dealt with these questions in Divisions II and III above. It is well settled that errors or propositions not assigned will not be considered on appeal. We have often so held. Osbey v. Nelson, 248 Iowa 571, 573, 81 N.W.2d 449, 451, and citations; Gilbrech v. Kloberdanz, 252 Iowa 509, 515, 107 N.W.2d 574, 578. Many other cases might be cited. That the same rule applies to "propositions" in equity cases as to "errors" in law actions, see Gilbrech v. Kloberdanz, supra, and 2 Drake Law Review 9. We have considered and determined the only two propositions stated as a basis for the cross-appeal.

XIII. The trial was long and involved, with a great volume of technical testimony and many exhibits offered. The parties disagreed at every possible point. It would be possible to extend this opinion into a maze of detailed figures. But the substantial differences between the litigants concern methods and formulas of accounting and procedures rather than actual computations. The trial court, faced with a massive problem of accounting and many detailed figures, gave the matter devoted and skilled attention. Its findings of fact are detailed and exhaustive, and its conclusions of law generally sound. We are impressed with its study of the case, its computations of figures and the reasoning by which it arrived at its result.

Of course it is our duty to try the case de novo, and this we have endeavored to do; but we have the right to take the findings and rulings of the trial court into account as valuable aids in our consideration. We have concluded that the court was generally correct in its approach to the many problems involved and in its computations based upon what it determined to be the proper methods of the required accounting.

The case is affirmed upon the appeal of the accounting defendants, and reversed upon the cross-appeal of the plaintiff

McLaughlin as determined in Divisions II and III above.—Affirmed on appeal of accounting defendants; reversed on cross-appeal of accounting plaintiff. The cause is remanded for further proceedings in accordance with this opinion and the remaining issues.

All JUSTICES concur.